# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| GSR MARKETS LIMITED | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | FILE NO._____ |
| DIANA MCDONALD, MCDONALD | ) | |
| LAW GROUP LLC D/B/A LAW OFFICES | ) | |
| OF DIANA MCDONALD, LLC, | ) | **JURY TRIAL DEMANDED** |
| VALKYRIE GROUP, LLC, HUGH | ) | |
| AUSTIN, BRANDON AUSTIN, AND | ) | |
| WELLS FARGO BANK, N.A. | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

GSR Markets Ltd. ("Plaintiff" or "GSR Markets") files this Complaint against Defendants Diana McDonald ("McDonald"), McDonald Law Group LLC d/b/a Law Offices of Diana McDonald, LLC ("McDonald Law"), Valkyrie Group, LLC ("Valkyrie"), Hugh Austin, Brandon Austin, and Wells Fargo Bank, N.A. ("Wells Fargo") (collectively, "Defendants"), and shows as follows:

## INTRODUCTION

This is an emergency action brought to stop Defendants from engaging in an illegal investment scheme designed to fraudulently deceive investors in connection

with the sale of Bitcoin through a so-called "Private Deed of Agreement for Bitcoin Asset Exchange/Transaction."

The facts of this case show a straight forward instance of fraud. Valkyrie promised that it would provide Bitcoin to GSR Markets in exchange for $4 million. In reliance on that promise, GSR Markets wired $4 million into the Wells Fargo IOLTA account (a fiduciary account) of McDonald and McDonald Law.

When Valkyrie failed to provide the Bitcoin, GSR Markets demanded that its escrowed funds be returned. GSR Markets repeatedly reached out to all involved demanding it either receive the Bitcoin or a refund of its monies, and received nothing but a run-around. Everyone assured GSR Markets the Bitcoin or money was coming, no doubt to buy time so they could complete their fraud. In particular, McDonald, who was acting as the escrow agent and was only permitted to release funds under specified terms which she violated, falsely stated she had the funds and they would be returned. Ultimately, McDonald did return $2 million of GSR Market's money, but she (or other Defendants) retained the other $2 million.

GSR Markets also put Wells Fargo on notice that GSR Markets' money was sitting in a Wells Fargo fiduciary account, but Wells Fargo has failed and refused to take even basic steps to protect GSR Markets' money. Wells Fargo, rather than investigate or show any concern as to the missing funds, vouched for McDonald,

which only led to more delays and allowed the money trail to go cold.  This is despite Wells Fargo's likely knowledge that McDonald has been running an international Bitcoin scam through her trust account.  Wells Fargo has ensured that she is free to continue to do so, despite its knowledge of the fraud.

Defendants, including Wells Fargo, have participated in a scam to steal millions of dollars from GSR Markets and have done nothing but cover their tracks since then.  GSR Markets has out of pocket damages of more than $2.3 million. GSR Markets is entitled to not only compensatory damages, but also punitive damages and its attorneys' fees.

## THE PARTIES

### 1.

Plaintiff is a Hong Kong company.

### 2.

Defendant McDonald, the closing attorney and settlement agent, is a Georgia resident and, upon information and belief, resides at 2633 Winsley Place, Duluth, Georgia 30097.

### 3.

Defendant McDonald Law, McDonald's law firm, is a Georgia limited liability company and may be served through its Registered Agent for service of

process, Diana McDonald, at 4485 Tench Road, Suite 1410, Suwanee, Georgia 30024.

4.

Upon information and belief, Defendant Valkyrie is a limited liability company which maintains a business address in Florida at 21005 63rd Avenue East, Bradenton, Florida 34211.

5.

Defendant Hugh Austin, principal of Valkyrie, is a New York resident and, upon information and belief, resides at 7 Lost Meadow Lane, Port Jefferson, New York 11777.

6.

Defendant Brandon Austin, Managing Member and CEO of Valkyrie, is a Florida resident and, upon information and belief, resides at 21005 63rd E Ave., Bradenton, Florida 34211.

7.

Valkyrie, Hugh Austin, and Brandon Austin are referred to herein as the "Sellers."

8.

Defendant Wells Fargo is a national banking association domiciled in

-4-

California, and may be served through its Registered Agent for service of process, Corporation Service Company, 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

## JURISDICTION AND VENUE

9.

Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction to hear this matter, as every plaintiff is completely diverse in citizenship from every defendant, and the amount in controversy exceeds the sum of $75,000.00.

10.

Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction to hear this matter, as some of the claims arise out of the laws of the United States. This Court also has ancillary jurisdiction over the claims arising out of the laws of the State of Georgia.

11.

Pursuant to 28 U.S.C. § 1391, venue is proper in this judicial district as it is the judicial district in which a substantial number of the events or omissions giving rise to these claims occurred, and this judicial district has personal jurisdiction over certain of the Defendants that reside or do business in Georgia.

## BACKGROUND FACTS

**A.      Plaintiff Agrees to Transfer $4,000,000 into Defendant McDonald's IOLTA Account in Exchange for Bitcoin**.

12.

Third party Austin Yavorsky of OTC Desks Ltd., LLC ("OTC Desks") contacted GSR Markets on or about January 1, 2019 about an opportunity to purchase Bitcoin from Alivic Corporation Pty, Ltd. ("Alivic").  While Alivic was the ultimate seller of the Bitcoin, Valkyrie (and its principals, Hugh and Brandon Austin) were acting as the brokers and ultimately signed the contract for the purchase of the Bitcoin.

13.

OTC Desks represented that it had previously done business with Sellers and their lawyer, McDonald, which was reassuring to GSR Markets.

14.

GSR Markets and OTC Desks discussed a potential $70,000,000 transaction for the purchase of Sellers' Bitcoin in two tranches, and the opportunity to acquire additional Bitcoin from Sellers in the future.

15.

Based on that call, GSR Markets sent a January 1, 2019 letter of intent,

indicating both that GSR Markets intended to purchase Bitcoin after conducting a test purchase, and that Plaintiff had the requisite funds.  OTC Desks responded to that letter on January 2, 2019 reiterating the parties' intent to enter into an agreement for the purchase and sale of Bitcoin.  True and correct copies of these January 1 and January 2 letters are attached in **Exhibit A** hereto.

16.

Based on Sellers' representations that it would in fact transfer Bitcoin to GSR Markets in exchange for money, on January 3, 2019, GSR Markets, OTC Desks, and Valkyrie entered into a Private Deed of Agreement for Bitcoin Asset Exchange/Transaction (the "Agreement").  A true and correct copy of the Agreement is attached in **Exhibit B** hereto.

17.

The value of Bitcoin changes (negative or positive) quickly, and the Agreement therefore contemplated a tight timeframe.  It was executed on January 3, 2019, and the first tranche of Bitcoin would be exchanged on January 4, 2019.

18.

The Agreement provided that Valkyrie would provide 1,500 Bitcoins to GSR Markets in an amount to be determined by market pricing at the time of the transaction.  The fast-changing nature of Bitcoin's value, even over 24 hours,

rendered it not possible to determine the Bitcoin's precise value at the time of the transaction.

19.

The Agreement provided that GSR Markets would wire the agreed-upon amount into an escrow account, which was McDonald Law's IOLTA account at Wells Fargo (the "IOLTA Account").  Sellers had insisted that Plaintiff use their attorney, McDonald, as escrow agent to hold GSR Markets' funds in trust for the closing and settlement of the transaction with Sellers.

20.

Upon confirmation of the funds being deposited into the Account, Valkyrie was to "initiate the placement of . . . [the] first tranche [of Bitcoin] directly to the buyers [sic] designated WALLET."

21.

Under the Agreement, OTC Desks, Valkyrie, and Brandon Austin, as a beneficiary, were to receive a 1% commission.  Likewise, McDonald was to receive an "escrow service charge" under the Agreement.

22.

By the time of the payment of funds into the Account, GSR Markets and the Sellers had agreed that GSR Markets would purchase 1,000 Bitcoins.  The market

price at the time of the transaction was $3,635 per Bitcoin.

23.

On January 3, 2019, Plaintiff wired $4,000,000 into the Account, expecting that it would immediately receive 1,000 Bitcoins from the Sellers.

24.

Based on that expectation, GSR Markets shorted those 1,000 Bitcoins, based on a purchase price of $3,635 per Bitcoin.

**B.    The Sellers and McDonald Steal Plaintiff's Money through Their Fraudulent Scheme.**

25.

The Sellers did not transfer any Bitcoin to Plaintiff, and they never have.

26.

The Sellers never intended to transfer any Bitcoin to Plaintiff.

27.

When it received no Bitcoin, Plaintiff immediately began calling and messaging the Sellers.  The responses to those messages confirm the Sellers never intended to transfer any Bitcoin to Plaintiff.

28.

Starting around January 3, 2019, and continuing through February 4, 2019,

Christian Gil, CEO of Plaintiff, and Yavorsky of OTC Desks exchanged numerous text messages regarding the status of the Bitcoin and the related deal.  A true and correct copy of this message string is attached as **Exhibit C** hereto.

29.

Those messages show that while Yavorsky claimed that his "main priority today is making sure your funds are returned," in fact he repeatedly and deliberately evaded Plaintiff's questions regarding the status of the Bitcoin and Plaintiff's $4,000,000.

30.

On January 7, 2019, Plaintiff notified Brandon Austin, Hugh Austin, and Yavorsky of Plaintiff's increasing damages given the failure to provide the promised Bitcoin.  In addition to the $4 million, GSR Markets had to unwind its shorting of bitcoin, losing an additional $380,000.  GSR Markets demanded it be refunded $4,380,000 by close of business on January 9, 2019.  A true and correct copy of that letter is attached hereto in **Exhibit D**.

31.

Also on January 7, 2019 Plaintiff, through counsel, e-mailed McDonald, demanding that she refund Plaintiff if there was to be any further delay in Sellers' delivery of the Bitcoin.

32.

McDonald claimed to reassure Plaintiff that all was well, stating that "I hereby confirm that if the seller fails to deliver by close of business today, January 7th, 2019, I will commence the process of transferring your client's escrowed funds via Wire Transfer to your client's account on January 8th, 2019."  A true and correct copy of that e-mail is attached hereto in **Exhibit E**, along with other communications between Plaintiff and McDonald.

33.

However, when the Bitcoin did not arrive by January 7, GSR Markets, through counsel, again demanded that McDonald return GSR Markets' $4 million. (Exhibit E.)  GSR Markets repeatedly emailed and called McDonald demanding its money, which should have been readily available in the Account.

34.

McDonald finally responded to GSR Markets, but not by carrying through on her promise to return Plaintiff's money to GSR Markets, but rather to provide more false assurances.  She claimed that "I have received written confirmation from my seller that the coins will be delivered on or before the end of business today."   McDonald further stated that the Sellers would deliver an additional 900 Bitcoin to Plaintiff, which she claimed she had negotiated with the Sellers.

(Exhibit E.)

35.

Again, the Bitcoin was not delivered, and McDonald did not provide any excuse for her or her so-called clients.

36.

On January 10, 2019, McDonald again promised Plaintiff that she would wire the $4 million back to GSR Markets, and she stated to both Plaintiff and Wells Fargo that she was going to a Wells Fargo branch that day to do so.  Once again, the money was not returned.

37.

Given the abuse of a trust account by a Georgia lawyer, Plaintiff sent a grievance to the State Bar of Georgia regarding McDonald and the cryptocurrency fraud scheme she and the Sellers were perpetrating.  Apparently, McDonald told the State Bar that she had Plaintiff's GSR Markets' money still in the Account.

38.

On January 18, 2019, GSR Markets actually did receive $2,000,000 in its account.  The wire was initiated by the McDonald Law Group and was from the Account.

-12-

39.

On January 24, 2019, McDonald wrote to Yavorsky: "If the coin situation is not remedied by the end of the day, I will see about the balance of the refund to [GSR Markets] on Friday. I still hate to think that these fellows were pulling a scam." (Exhibit E.)

40.

However, neither McDonald nor the Sellers have returned the remaining $2 million.

41.

On February 28, 2019, McDonald responded to Plaintiff's grievance with the State Bar of Georgia. For the very first time, McDonald acknowledged that upon receipt of the funds into the trust account, she immediately sent $2 million to her purported client, Alivic, the ultimate seller of the Bitcoin. This was contrary to everything McDonald had said up to that date, and was contrary to her obligations both under the law as an escrow agent and holder of an IOLTA account, and under the Agreement. It remains unclear where the money is.

**C.     Wells Fargo Refuses to Investigate the Fraud, Despite Evidence of the Account's Involvement in an International Cryptocurrency Scheme**.

42.

With McDonald and Sellers stonewalling, Plaintiff contacted a Wells Fargo on January 7, 2019.  Upon Plaintiff's explanation of the missing funds and likely Bitcoin fraud scheme, the Wells Fargo representative, rather than expressing concern, stated that McDonald was a valued Wells Fargo customer and high net worth individual, as if that were relevant.

43.

After the call, Plaintiff's counsel sent the Wells Fargo representative a follow up e-mail, formally demanding that Wells Fargo conduct an inquiry into the Account and the whereabouts of Plaintiff's $4 million and requesting that the account be frozen so that Plaintiff's money could be protected.  Plaintiff's communications with Wells Fargo are attached hereto as **<u>Exhibit F</u>**.

44.

Though, on that date, the Wells Fargo representative stated that he would "elevate [Plaintiff's] request/concerns immediately" and would be willing to assist Plaintiff (Exhibit F), Wells Fargo has consistently refused to freeze the Account,

and Plaintiff assumes it undertook no investigation of the fraudulent activity in the Account.

45.

Wells Fargo ignored its own internal policies and procedures when it refused to investigate alleged fraudulent activity in the IOLTA Account.

46.

In fact, when Plaintiff asked only for assurances that its money had not been removed from the Account, Wells Fargo responded that it was no longer going to talk with Plaintiff about the fraud.  Wells Fargo falsely claimed that some bank secrecy laws barred it from providing any information regarding Plaintiff's money, and said it required a court order before it could do anything further.

47.

Plaintiff's bank requested that Wells Fargo reverse the wire.  Knowing everything it knew, Wells Fargo did not reverse the wire, and did not respond to further communications.

**D.     Plaintiff's Litigation Counsel Makes Final Demands, and Plaintiff Is Forced to File this Lawsuit**.

48.

On January 31, 2018, Plaintiff's litigation counsel sent a letter to McDonald

demanding that she repay Plaintiff its outstanding $2 million.  McDonald

responded to Plaintiff's counsel making excuses for her previous utter lack of

responsiveness.  Yet again she claimed that she would resolve the matter in full the

following week, which was the week of February 4th, 2019.  However, McDonald

did not provide any assurances that Plaintiff's money remained in her account.

49.

Plaintiff demanded proof that the money was still in the account, but

McDonald only stated that the matter would be "completely resolved next week."

(Exhibit E.)

50.

The following week came and went without any response from McDonald.

Plaintiff did not hear anything further from McDonald, despite repeated emails.

51.

On February 4, 2019, Plaintiff, through counsel, sent a demand letter to

attorneys at Wells Fargo, expressing serious concerns and again requesting that

Wells Fargo freeze the Account.  Wells Fargo, responded on February 12 and

confirmed its position – that it was refusing to take any action to protect the funds

belonging to Plaintiff in McDonald's trust account, despite its knowledge that the

Account was involved in a cryptocurrency fraud.  (Exhibit F.)

52.

On February 6, 2019, Plaintiff, through counsel, demanded payment from Sellers in the amount of $2,380,000.  Yavorsky of OTC Desks was also copied on the correspondence.   A true and correct copy of that letter is attached as **Exhibit G**.  To date, neither Sellers nor Yavorsky have responded to that letter.

53.

To date, Plaintiff has never received any Bitcoin from the Sellers, and it has never been reimbursed the outstanding $2,000,000 that was supposed to be held in trust for it in the Account.

**COUNT ONE**
**TEMPORARY RESTRAINING ORDER AND**
**INTERLOCUTORY INJUNCTION**
(as to all Defendants)

54.

Plaintiff realleges the allegations contained in the foregoing paragraphs as though fully set forth herein.

55.

Plaintiff seeks a temporary restraining order and interlocutory injunction (a) ordering Wells Fargo or McDonald / McDonald Law to interplead Plaintiff's $2 million with the Court; or (b) in the alternative, freezing the Account and requiring

all Defendants to cease and desist from transferring any of Plaintiff's funds from the Account, and appointing a receiver over the Account to ensure Plaintiff's funds are not dissipated.

56.

An injunction is necessary in order to maintain the status quo, and to ensure that Defendants do not distribute any funds of Plaintiff that are currently or in the future in the Account, use any of Plaintiff's money for any person's purposes other than Plaintiff's own purposes, or direct payments of Plaintiff's funds to any third party.

57.

Without injunctive relief, Plaintiff will suffer irreparable harm because Plaintiff's funds will be converted and stolen from Plaintiff.

## COUNT TWO
### FRAUD
(as to Valkyrie, Hugh Austin, and Brandon Austin)

58.

Plaintiff realleges the allegations contained in the foregoing paragraphs as though fully set forth herein.

59.

In an effort to induce Plaintiff to wire $4 million into an escrow account,

Valkryie, Hugh Austin, and Brandon Austin, promised that they would transfer Bitcoin to Plaintiff in exchange for Plaintiff's wiring funds into the Account.

60.

Sellers made these representations and assurances with the knowledge that they were false and were not intended to be honored at the time they were made. Sellers never intended to transfer any Bitcoin to Plaintiff.

61.

Based on the representations of Sellers, Plaintiff reasonably relied upon Sellers and entered into the Agreement and wired $4 million into the Account.

62.

As a result of the Sellers' fraudulent conduct, Plaintiff has been damaged in an amount to be determined at trial, but no less than **TWO MILLION THREE HUNDRED EIGHTY THOUSAND DOLLARS AND NO CENTS ($2,380,000)**.

## COUNT THREE
### FRAUD
(as to McDonald and McDonald Law)

63.

Plaintiff realleges the allegations contained in the foregoing paragraphs as though fully set forth herein.

64.

In an effort to induce Plaintiff to hold off on taking further action in pursuit of its missing funds, McDonald and McDonald Law made misstatements to Plaintiff and its attorneys that Plaintiff would receive the Bitcoin and the missing $2,000,000.

65.

Despite those representations, McDonald may have immediately released $2 million of Plaintiff's money from the Account.

66.

McDonald and McDonald Law made such representations multiple times, with the intention that every misrepresentation would induce Plaintiff to refrain from acting, which Plaintiff did.

67.

These representations and assurances were made knowingly, recklessly, and maliciously, and Plaintiff justifiably relied on McDonald's and McDonald Law's, representations to its detriment.

68.

As a proximate result of McDonald's and McDonald Law's fraudulent conduct, Plaintiff has been damaged in an amount to be determined at trial, but no

less than **TWO MILLION DOLLARS AND NO CENTS ($2,000,000)**.

## COUNT FOUR
## AIDING AND ABETTING FRAUD
(as to Wells Fargo)

### 69.

Plaintiff realleges the allegations in the foregoing paragraphs as though fully set forth herein.

### 70.

Wells Fargo is the holder of the Account, in which funds were being held for Plaintiff's benefit.

### 71.

No later than January 7, 2019, Wells Fargo was aware of Plaintiff's allegations that McDonald and McDonald Law were defrauding Plaintiff as set forth above in Count Three.

### 72.

Wells Fargo refused to take any action.  To the extent Plaintiff's funds have been dissipated, Wells Fargo is jointly and severally responsible for Plaintiff's damages.

### 73.

As a proximate result of Wells Fargo aiding and abetting of fraudulent

conduct, Plaintiff has been damaged in an amount to be determined at trial, but no less than **TWO MILLION DOLLARS AND NO CENTS ($2,000,000)**.

<u>**COUNT FIVE**</u>
**BREACH OF CONTRACT**
(as to Valkyrie, in the alternative to Count Two)

74.

Plaintiff realleges the allegations contained in the foregoing paragraphs as though fully set forth herein.

75.

The Agreement is a binding and enforceable agreement.

76.

Under the Agreement, Valkyrie was to deliver 1,500 Bitcoin to Plaintiff in exchange for Plaintiff's placement of funds in the Account.

77.

Plaintiff wired $4,000,000 to the Account on January 3, 2019.

78.

Valkyrie has never delivered any Bitcoin to Plaintiff.

79.

Plaintiff satisfied its obligations under the Agreement, while Valkyrie did not.

80.

As a result of Valkyrie's breach of contract, Plaintiff has been damaged in an amount to be determined at trial, but no less than **TWO MILLION THREE HUNDRED EIGHTY THOUSAND DOLLARS AND NO CENTS ($2,380,000)**.

<u>**COUNT SIX**</u>
**BREACH OF FIDUCIARY DUTY**
(as to McDonald and McDonald Law)

81.

Plaintiff realleges the allegations in the foregoing paragraphs as though fully set forth herein.

82.

McDonald and McDonald Law were to hold Plaintiff's funds in the Account in trust for Plaintiff.  As such, they owed certain fiduciary duties to Plaintiff, including the duty to act in good faith and in the best interests of Plaintiff.

83.

McDonald and McDonald Law breached their fiduciary duty by refusing to refund Plaintiff its outstanding $2,000,000, refusing to tell Plaintiff where its money is, if its money is even still in the Account, and in fact transferring Plaintiff's funds out of the Account to an unknown location.

84.

McDonald's and McDonald Law's misconduct was willful, reckless, malicious, deceptive, and likely criminal, entitling Plaintiff to an award of punitive damages in an amount to be determined at trial.

85.

As a result of McDonald and McDonald's law breach of fiduciary duty, Plaintiff has been damaged in an amount to be determined at trial, but no less than **TWO MILLION DOLLARS AND NO CENTS ($2,000,000)**.

<u>**COUNT SEVEN**</u>
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
(as to Wells Fargo)

86.

Plaintiff realleges the allegations in the foregoing paragraphs as though fully set forth herein.

87.

Wells Fargo maintained the Account, of which McDonald and McDonald law were fiduciaries, and of which Plaintiff was a beneficiary.

88.

As set forth above, McDonald and McDonald Law owed a fiduciary duty to Plaintiff regarding the funds in the Account, and no later than January 7, 2019

Wells Fargo was aware of this fact.

89.

No later than January 7, 2019, Wells Fargo was aware that Plaintiff, a beneficiary of the Account, was concerned that its funds would be mishandled by McDonald and McDonald Law.

90.

To date, Wells Fargo has taken no action to ensure that Plaintiff's funds are safeguarded.  Wells Fargo has, upon information and belief, done no investigation of the matter, and has taken no steps to freeze the account.

91.

To the extent Wells Fargo permitted Plaintiff's funds to be transferred out of the account despite such knowledge, it is responsible for aiding and abetting McDonald and McDonald Law's breach of fiduciary duty to Plaintiff.

**<u>COUNT SEVEN</u>**
**NEGLIGENCE**
(as to Wells Fargo)

92.

Plaintiff realleges the allegations in the foregoing paragraphs as though fully set forth herein.

93.

Wells Fargo maintained the Account, which held funds for Plaintiff's benefit.

94.

No later than January 7, 2019, Wells Fargo was aware that Plaintiff, a beneficiary of the Account, was concerned that its funds would be mishandled by McDonald and McDonald Law.

95.

Wells Fargo owed Plaintiff a duty of care.

96.

Wells Fargo refused to take any steps to protect Plaintiff's funds. To the extent Plaintiff's funds have been dissipated, Wells Fargo is jointly and severally responsible for Plaintiff's damages.

97.

Wells Fargo's actions were intentional as set forth above. However, at a minimum, Wells Fargo was negligent or grossly negligent in its failure to protect Plaintiff's funds, which it held.

98.

As a proximate result of Wells Fargo aiding and abetting of fraudulent

conduct, Plaintiff has been damaged in an amount to be determined at trial, but no less than **TWO MILLION DOLLARS AND NO CENTS ($2,000,000)**.

<u>**COUNT EIGHT**</u>
**CONSPIRACY**
(as to McDonald, McDonald Law, and Sellers)

99.

Plaintiff realleges the allegations contained in the foregoing paragraphs as though fully set forth herein.

100.

McDonald, McDonald Law, and the Sellers conspired with each other and on behalf of each other to commit fraud against Plaintiff.

101.

As a result of their conspiracy, Plaintiff has been damaged in an amount to be determined at trial, but no less than **TWO MILLION THREE HUNDRED EIGHTY DOLLARS AND NO CENTS ($2,380,000)**.

<u>**COUNT NINE**</u>
**CONVERSION**
(as to the Sellers, McDonald, and McDonald Law)

102.

Plaintiff realleges the allegations contained in the foregoing paragraphs as though fully set forth herein.

103.

The Sellers, McDonald, and McDonald Law acquired $4,000,000 by virtue of Plaintiff's transfer of such funds into the Account.

104.

Plaintiff demanded reimbursement of its $4,000,000.

105.

The Sellers, McDonald, and McDonald Law refuse to fully reimburse Plaintiff.

106.

The Sellers, McDonald, and McDonald Law are exercising unauthorized dominion over the funds and have thereby converted the funds to their own use.

107.

As a result of this conversion, Plaintiff has been damaged in an amount to be determined at trial, but no less than **TWO MILLION DOLLARS AND NO CENTS ($2,000,000)**.

## **COUNT TEN**
## **AIDING AND ABETTING CONVERSION**
(as to Wells Fargo)

108.

Plaintiff realleges the allegations contained in the foregoing paragraphs as

though fully set forth herein.

109.

Wells Fargo, as the holder of the Account, have aided and abetted the Sellers, McDonald, and McDonald Law in their conversion of Plaintiff's funds.

110.

No later than January 7, 2019, Wells Fargo was aware of Plaintiff's allegations that its funds were at risk.

111.

Wells Fargo refused to take any action, and instead assisted the Sellers, McDonald, and McDonald Law in its conversion of Plaintiff's funds.

112.

As a result of this conspiracy, Plaintiff has been damaged in an amount to be determined at trial, but no less than **TWO MILLION DOLLARS AND NO CENTS ($2,000,000)**.

## COUNT ELEVEN
### GEORGIA RICO (O.C.G.A. § 16-14-1 *et seq.*)
(as to McDonald, McDonald Law, and the Sellers)

113.

Plaintiff realleges the allegations contained in the foregoing paragraphs as though fully set forth herein.

114.

McDonald, McDonald Law, Valkyrie, and the Sellers intentionally conducted and participated in a scheme to defraud Plaintiff by engaging in a pattern of racketeering activity.

115.

McDonald, McDonald Law, and the Sellers held themselves out as persons or entities willing to enter into a Bitcoin trade, or facilitate such trade, when in reality they had no such intention.  Instead, McDonald, McDonald Law, and the Sellers were operating with the singular goal of inducing unwitting buyers to purchase fraudulent cryptocurrency and enriching themselves with the funds Plaintiff paid.

116.

In order to perpetuate the scheme to defraud, McDonald, McDonald Law, and the Sellers engaged in a pattern of racketeering activity, including theft by deception and conversion, whereby McDonald, McDonald Law, and the Sellers would divert funds entrusted to them by buyers under the guise of a Bitcoin trade.

117.

McDonald, McDonald Law, and the Sellers knew that the Bitcoin offered by Sellers were fraudulent, but concealed material adverse information from Plaintiff

in order to perpetuate the scheme.

118.

McDonald, McDonald Law, and the Sellers continued this pattern of theft by conversion and deception, defrauding Plaintiff.

119.

The pattern of racketeering activity also consisted of various acts of mail fraud and wire fraud.  Specifically, McDonald, McDonald Law, and the Sellers knowingly (and with specific intent) transmitted, or caused to be transmitted, the following by internet services and web mail in furtherance of the scheme to defraud, including but not limited to:

(a)     Contract documents purportedly for the purpose of entering into a trade of Bitcoin for funds; and

(b)     Correspondence and other documents intended to cause the transfer of Plaintiff's funds to the Account and to prevent Plaintiff from taking further action to immediately retrieve its funds.

120.

McDonald, McDonald Law, and the Sellers committed each of these predicate acts for the purpose of advancing the scheme to defraud buyers,

including Plaintiff, into believing that their funds were being placed in the Account for a legitimate trade of funds for Bitcoin.

121.

McDonald, McDonald Law, and the Sellers targeted Plaintiff in their scheme to defraud and intended for Plaintiff to rely upon false and misleading statements and omissions regarding the Agreement and the Bitcoin.

122.

Plaintiff relied on misrepresentations and omissions by McDonald, McDonald Law, and the Sellers in connection with making the decision to enter into the Agreement and transfer funds to the Account.

123.

Such misrepresentations and omissions would have been relied upon by a reasonable person.

124.

As a direct and proximate result of such reliance, Plaintiff has been damaged in an amount to be determined at trial, but no less than **TWO MILLION THREE HUNDRED EIGHTY DOLLARS AND NO CENTS ($2,380,000)**.

125.

Plaintiff is entitled to treble damages of no less than **FIVE MILLION**

**DOLLARS ($5,000,000)**, punitive damages, attorneys' fees, and costs of litigation pursuant to O.C.G.A. § 16-14-6(c).

### COUNT TWELVE
### UNJUST ENRICHMENT
(as to McDonald, McDonald Law, and the Sellers)

126.

Plaintiff realleges the allegations contained in the foregoing paragraphs as though fully set forth herein.

127.

McDonald, McDonald Law, and the Sellers personally profited from their fraudulent scheme.

128.

By fraudulently inducing Plaintiff to enter into the Agreement, McDonald, McDonald Law, and the Sellers received $4,000,000 from Plaintiff.

129.

While Plaintiff has lost at least $2,000,000, McDonald, McDonald Law, and the Sellers continue to enjoy the benefit of the $4,000,000 and the Bitcoin which should have been transferred to Plaintiff.

130.

The principles of equity and fairness do not allow McDonald, McDonald

Law, or the Sellers to retain the outstanding $2,000,000, which McDonald, McDonald Law, and the Sellers should return to Plaintiff.

### 131.

Plaintiff is entitled to have a constructive trust imposed upon all the funds that McDonald, McDonald Law, and the Sellers received in connection with the fraudulent transactions.

### 132.

As a direct and proximate result of McDonald, McDonald Law, and the Sellers actions, Plaintiff has been damaged in an amount to be determined at trial, but no less than **TWO MILLION DOLLARS AND NO CENTS ($2,000,000)**.

## COUNT THIRTEEN
## ACCOUNTING AND EQUITABLE AND INJUNCTIVE RELIEF
(as to all Defendants)

### 133.

Plaintiff realleges the allegations contained in the foregoing paragraphs as though fully set forth herein.

### 134.

Plaintiff requests an accounting of all funds unlawfully obtained and converted by Defendants.

135.

Plaintiff has a reasonable and serious concern that Defendants have dispersed and will continue to disperse Plaintiff's funds. Accordingly, Plaintiff requests a constructive trust over all of Plaintiff's funds in the Account.

136.

Plaintiff further requests preliminary and permanent injunctive relief to prevent Defendants from further dispersing Plaintiff's funds.

**COUNT FOURTEEN**
**VIOLATION OF § 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND STATE LAWS**
(as to the Sellers, McDonald, McDonald Law)

137.

Plaintiff realleges the allegations contained in the foregoing paragraphs as though fully set forth herein.

138.

The Sellers, McDonald, and McDonald Law caused Plaintiff to purchase securities as defined in Section 3(a)(9) of the Exchange Act (15 U.S.C. § 78c(a)(10)).

139.

The transaction described herein was a securities transaction.  The value of Bitcoin changes rapidly, and the timeframe for performance was short.  Plaintiff expected to profit off of the Bitcoin, shorting it in the Bitcoin market. Additionally, McDonald has returned to Plaintiff its money slowly, further evidence the transaction was a securities transaction.

140.

Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

141.

Pursuant to O.C.G.A. § 10-5-50, "[i]t is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly: (1) To employ a device, scheme, or artifice to defraud; (2) To make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the

statement made, in the light of the circumstances under which it is made, not misleading; or (3) To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person."

142.

The Sellers, McDonald, and McDonald Law employed a manipulative or deceptive device, scheme, or contrivance in connection with the purchase of the Bitcoin by use of the means of instrumentalities of interstate commerce or of the mails in violation of Section 10(b) of the Exchange Act and the rules promulgated thereunder, and O.C.G.A. § 10-5-50.

143.

The Sellers, McDonald, and McDonald Law carried out a plan, scheme, and course of conduct that was intended to and did deceive Plaintiff regarding the Sellers', McDonald's, and McDonald Law's intention to actually provide the Bitcoin, and the Sellers', McDonald's, and McDonald Law's intention to hold money in escrow pending the transfer of the Bitcoin.

144.

In violation of Section 10(b) of the Exchange Act, the rules promulgated thereunder, and the Georgia Securities Act, the Sellers, McDonald, and McDonald Law made untrue statements of material fact and/or omitted to state material facts

necessary to make the statements not misleading, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff. Such conduct is so malicious, willful, outrageous, in bad faith, and beyond the norm of society that punitive damages should be awarded.

145.

As alleged above, the Sellers, McDonald, and McDonald Law at all times acted with scienter, or at least reckless indifference to the truth: the Sellers never intended to provide the Bitcoin, and the Sellers, McDonald, and McDonald Law never intended to return Plaintiff's money when the sale did not complete.

146.

The Sellers, McDonald, and McDonald Law scienter is further evidenced by the $2,000,000 benefit they gained from offering the Bitcoin and promising to provide the Bitcoin to Plaintiff.

147.

The Sellers, McDonald, and McDonald Law knew or should have known that Plaintiff would rely on this information and encouraged that reliance, ultimately inducing Plaintiff to enter into the Agreement and put $4,000,000 in the Account.

148.

Plaintiff was not aware of the deception until the Bitcoin was never delivered.  Had Plaintiff known of the true facts and circumstances surrounding the transaction, it would not have purchased the securities.

149.

The Sellers, McDonald, and McDonald Law are also liable to Plaintiff for violations of the Georgia Securities Act pursuant to O.C.G.A. §§ 10-5-58(b) and 10-5-58(d).

150.

The actions of the Sellers, McDonald, and McDonald Law have damaged Plaintiff in an amount to be determined at trial, but in any event not less than **TWO MILLION THREE HUNDRED EIGHTY DOLLARS AND NO CENTS ($2,380,000)**.

## COUNT FIFTEEN
### VIOLATION OF THE COMMODITIES EXCHANGE ACT
(as to the Sellers, and in the alternative to Count Fourteen)

151.

Plaintiff realleges the allegations in the foregoing paragraphs as though fully set forth herein.

152.

The Bitcoin was not delivered to Plaintiff within 28 days, and the transaction described herein is therefore not an exempt over-the-counter transaction.

153.

Bitcoin is a commodity.

154.

The Commodities Exchange Act makes it unlawful for any person in connection with any order to make a contract of sale of commodity for future delivery to cheat or defraud the other person, to make any false statement, or to willfully deceive the other person.  7 U.S.C. § 6(b).

155.

The Commodities Exchange Act also provides a private cause of action to a person who paid money, such as Plaintiff.  7 U.S.C. § 25(a)(1)(B).

156.

The Sellers, McDonald, and McDonald Law have violated the Commodities Exchange Act by their false statements as described herein, which deceived Plaintiff into depositing $4 million in the Account.

157.

The actions of the Sellers, McDonald, and McDonald Law have damaged Plaintiff in an amount to be determined at trial, but in any event not less than **TWO MILLION THREE HUNDRED EIGHTY DOLLARS AND NO CENTS ($2,380,000)**.

<u>**COUNT SIXTEEN**</u>
<u>**APPOINTMENT OF RECEIVER**</u>

158.

Plaintiff realleges the allegations in the foregoing paragraphs as though fully set forth herein.

159.

Plaintiff has a reasonable and serious concern that Defendants are not acting in the best interest of Plaintiff.

160.

Given the uncertainty as to the activities of Defendants relating to Plaintiff's outstanding $2,000,000, it is necessary that the Court appoint a receiver for the Account and for any assets of the Defendants that may ultimately be used to refund Plaintiff.

## COUNT SEVENTEEN
**PUNITIVE DAMAGES**
(as to all Defendants)

161.

Plaintiff realleges the allegations in the foregoing paragraphs as though fully set forth herein.

162.

Defendants' conduct, as particularized above, was willful, intentional, and reckless.

163.

As a result of the foregoing misconduct, Plaintiff is entitled to recover punitive damages in an amount to be determined at trial but in any event not less than **FIVE MILLION DOLLARS AND NO CENTS ($5,000,000)**.

## COUNT EIGHTEEN
**ATTORNEYS' FEES**
(as to all Defendants)

164.

Plaintiff realleges the allegations in the foregoing paragraphs as though fully set forth herein.

165.

Defendants have acted in bad faith, and has caused Plaintiff unnecessary trouble, time, and expense, thereby entitling Plaintiff to recover its attorneys' fees and costs pursuant to O.C.G.A. § 13-6-11.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that judgment be entered in its favor and against Defendants as follows:

(a)   Compensatory damages against Defendants in an amount to be determined at trial;

(b)   Punitive damages against Defendants in an amount to be determined at trial;

(c)   All costs and expenses, including attorney's fees, against Defendants;

(d)   Enter an interlocutory injunction against all Defendants;

(e)   Enter a temporary restraining order against all Defendants;

(f)   Order an Accounting of Plaintiff's funds in the Account;

(g)   Place a constructive trust on the Account;

(h)   Appoint a Receiver over the Account; and

(i)   Such other relief as the Court shall deem just and proper.

This 1st day of March, 2019.

/s/ Richard L. Robbins
Richard L. Robbins
Georgia Bar No. 608030
rrobbins@robbinsfirm.com
Vincent Russo
Georgia Bar No. 558262
vrusso@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, NW
Atlanta, GA 30318
Telephone:   (678) 701-9381
Facsimile:   (404) 856-3250

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| GSR MARKETS LIMITED<br><br>  Plaintiff,<br><br>v.<br><br>DIANA MCDONALD, MCDONALD<br>LAW GROUP LLC D/B/A LAW OFFICES<br>OF DIANA MCDONALD, LLC,<br>VALKYRIE GROUP, LLC, HUGH<br>AUSTIN, BRANDON AUSTIN, AND<br>WELLS FARGO BANK, N.A.<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION

FILE NO._____

**JURY TRIAL DEMANDED**

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. §1746, I verify under penalty of perjury under the

laws of the United States of America that the foregoing is true and correct.

Executed on February 26 2019

CRISTIAN GIL, on behalf of GSR Markets
Limited

Title: CEO