# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

GSR Markets Limited,

    Plaintiff,

v.          Case No. 1:19-cv-1005-MLB

Diana McDonald, et al.,

    Defendants.

_____/

## **OPINION & ORDER**

After a failed attempt to purchase Bitcoin and the theft of its purchase money, Plaintiff GSR Markets Limited ("GSR") sued Defendant Wells Fargo Bank, N.A. ("Wells Fargo") for aiding and abetting fraud, breach of fiduciary duty, and conversion; negligence; accounting and equitable and injunctive relief; punitive damages; and attorneys' fees. (Dkt. 76 ¶¶ 134–147, 153–163, 171–180, 190–198, 219–222, 244–251.) Defendant moves for summary judgment on all claims and moves for leave to file its statement of undisputed facts in support of its motion for summary judgment. (Dkts. 217; 229.) The Court grants those motions.

# I.    Background

## A.    Motion for Leave to File Statement of Facts

On July 9, 2021, Defendant filed its motion for summary judgment. (Dkt. 217.)  About five days later, Defendant realized it had mistakenly failed to file its statement of undisputed facts.  (Dkt. 229-4 ¶ 8.)  When asked, Plaintiff took "no position" on whether Defendant should be permitted to file its statement of undisputed facts out of time.  (Dkt. 229-5 at 2.)  Defendant filed a motion asking the Court for permission to do so.  (Dkt. 229.)

Federal Rule of Civil Procedure 6(b) governs extensions of time in which to file motions and responsive documents.  Under Rule 6(b)(1)(B), when an act is required or allowed to be done within a specified time, the Court "may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B); *Fisher v. Office of State Att'y 13th Judicial Circuit Fla.*, 162 F. App'x 937, 940 (11th Cir. 2006) ("Rule 6(b) specifically contemplates that a party can obtain an extension of time even after missing a deadline.").  The Supreme Court has designated four factors a court should consider to determine whether a late filing constitutes

excusable neglect.  *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*, 507 U.S. 380, 395 (1993).   These factors include: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith.  *Id.*  "[T]he determination of excusable neglect is an equitable one that should take into account the totality of the circumstances surrounding the party's omission."  *Safari Programs, Inc. v. CollectA Int'l Ltd.*, 686 F. App'x 737, 744 (11th Cir. 2017) (citing *Pioneer*, 507 U.S. at 395).

The Court finds good cause exists to extend the time for Defendant to file its statement of undisputed facts.  First, the filing did not prejudice Plaintiff in its ability to respond to Defendant's motion for summary judgment because the facts were included in the motion itself, there was only a five-day delay, and the statement of facts was filed on the docket long before Plaintiff's response to the motion for summary judgment was due.  Second, the delay did not adversely impact the judicial proceedings.  Third, counsel for Defendant did not deliberately disregard Local Rule 56.1 and the Court's standing order when omitting the statement of

undisputed facts. The omission was simply an oversight by counsel. *Cheney v. Anchor Glass Container Corp.*, 71 F.3d 848, 850 (1996) (nothing to indicate counsel deliberately disregarded the local rule and because the "nonfiling was simply an innocent oversight by counsel," there was no showing of bad faith); *Sorenson v. Delta Air Lines, Inc.*, 2021 WL 2667528, at *1–2 (N.D. Ga. May 17, 2021) ("[T]here is no indication that Defendant acted in bad faith. Indeed, it appears that Defendant addressed the issue as quickly as possible once it became aware of it." (internal citation omitted)). The Court grants Defendant's motion such that its statement of undisputed facts is deemed timely.

### B.   The Court's Use of Proposed Facts and Responses

The Court draws the facts largely from the parties' submissions. In support of its motion for summary judgment, Defendant filed a statement of undisputed material facts (Dkt. 229-2). *See* LR 56.1(B)(1), NDGa. Plaintiff responded to Defendant's statement of material facts (Dkt. 235). *See* LR 56.1(B)(2)(a). Plaintiff also filed a separate statement of facts that it contends are material and present genuine issues for trial (Dkt. 236). *See* LR 56.1(B)(2)(b). Defendant responded to Plaintiff's statement of additional facts (Dkt. 241). *See* LR 56.1(B)(3). The Court did not

consider Defendant's reply to Plaintiff's response to Defendant's statement of undisputed material facts (Dkt. 242). As several judges in this District have noted, the Local Rules do not provide for reply filings in further support of a party's own statement of material facts. *See Shenzhen Shenchuang Elec. Appliance Co. v. HauteHouse, LLC*, 2021 WL 5033823, at *1 n.2 (N.D. Ga. Sept. 1, 2021); *Moore-Tolden v. AirTran Airways, Inc.*, 2009 WL 10666355, at *2 (N.D. Ga. July 2, 2009), *adopted by* 2009 WL 10669476 (N.D. Ga. Aug. 28, 2009). And these judges have opted to ignore any such filings. *See, e.g.*, *Shenzhen*, 2021 WL 5033823, at *1 n.2. This Court follows suit and ignores Defendant's reply filing (Dkt. 242).

The Court uses the parties' proposed facts and responses as follows. When a party does not dispute the other's fact, the Court accepts it for purposes of summary judgment and cites the proposed fact and corresponding response. When one side admits a proposed fact in part, the Court includes the undisputed part. When one side denies the other's proposed fact in whole or in part, the Court reviews the record and determines whether a fact dispute exists. If the denial lacks merit, the Court deems the fact admitted so long as the record citation supports it.

If a fact is immaterial, it is excluded.[1]  If a fact is stated as an issue or legal conclusion, it is excluded.  *See* LR 56.1(B)(1)(c).  Where appropriate, the Court modifies one party's fact per the other's response when the latter better reflects the record.  Finally, as needed, the Court draws some facts directly from the record.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

## C.    Facts

Plaintiff is a digital asset trading company that sought to purchase Bitcoin from Alivic Corporation Pty., Ltd.  ("Alivic").  Defendants Hugh Austin, Brandon Austin, and the Valkyrie Group, LLC, were supposed to broker the deal.  The parties designated Defendant Diana McDonald, a Georgia lawyer, as the escrow agent.  She had IOLTA accounts with Defendant Wells Fargo to receive and distribute the money.  Plaintiff

---

[1] Some proposed facts the Court declines to exclude on materiality grounds are not "material" as that term is generally employed in the summary judgment context.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (identifying material facts as those that "might affect the outcome of the suit under the governing law").  Some are included for background purposes or to generate context for the Court's analysis.  Which facts ultimately prove material should be apparent from the analysis.

wired $4 million into one of Ms. McDonald's IOLTA accounts but never received the Bitcoin. Ms. McDonald disbursed much of the money, returning only $2 million back to Plaintiff. Plaintiff now seeks to hold Wells Fargo liable for its alleged negligent response to Plaintiff's concerns of potential fraud surrounding Ms. McDonald's accounts. With that background, the more detailed facts necessary to address summary judgment are as follows.

### 1.    The Underlying Transaction

Plaintiff, a Hong Kong company, was formed in 2013 by Cristian Gil, Alex Sirkia, and Richard Rosenblum. (Dkts. 229-2 ¶ 39; 235 ¶ 39.) Plaintiff describes itself as an algorithmic trading company that specializes in digital assets. (Dkts. 229-2 ¶ 45; 235 ¶ 45.) Plaintiff trades in Bitcoin and other cryptocurrency. (Dkts. 229 2 ¶¶ 48, 51; 235 ¶¶ 48, 51.) Plaintiff is experienced in trading tens or hundreds of millions of dollars in cryptocurrencies. (Dkts. 229-2 ¶ 46; 235 ¶ 46.) Plaintiff testified that over the past seven years, banks have become unfriendly towards cryptocurrency transactions. (Dkts. 229-2 ¶ 50; 235 ¶ 50.) Plaintiff also knows that cryptocurrency transactions are risky. Mr. Gil testified there "are many so-called brokers in the space who don't conduct

themselves as professionally as the brokers [he] [was] used to dealing with when [he] used to trade oil for Goldman Sachs. But that is . . . just the nature of the business." (Dkt. 221-1 at 72:4–10.)

On January 1, 2019, Austin Yavorsky, a broker with a company called OTC Desks Ltd., contacted Mr. Gil about an opportunity for Plaintiff to purchase Bitcoin. (Dkts. 229-2 ¶ 71; 235 ¶ 71.)  Yavorsky explained he was in contact with a large Bitcoin broker that would also be part of the transaction. (Dkts. 229-2 ¶¶ 74–75; 235 ¶¶ 74–75.) Plaintiff confirmed its interest. (*Id.*)  Mr. Gil had a second call with Yavorsky that day during which Yavorsky introduced Mr. Gil to his "large Bitcoin broker"—Valkyrie Group, LLC, and its owners, Hugh Austin and Brandon Austin. (Dkts. 229-2 ¶¶ 76–77; 235 ¶¶ 76–77.)  He also introduced Ms. McDonald by name. (*Id.*)  Plaintiff had not previously done business with Yavorsky, OTC Desks, the Austins, or Valkyrie. (Dkts. 229-2 ¶¶ 241, 247; 235 ¶¶ 241, 247.)  The second call made Mr. Gil "feel a bit strange" because Hugh Austin "sounded a bit like a con man." (Dkts. 229-2 ¶ 79; 235 ¶ 79.)  At some point between January 1 and January 3, Plaintiff also learned Louie Sumich and his company, Alivic, would be the sellers. (Dkt. 221-1 at 51:9–18, 51:14–18, 61:24–

62:1.)  Plaintiff had never transacted business with Sumich or Alivic. (Dkts. 229-2 ¶ 252; 235 ¶ 252.)

Later that day, Plaintiff sent a non-binding letter of intent to OTC Desks, agreeing to purchase Bitcoin from Alivic.  (Dkts. 229-2 ¶ 80; 235 ¶ 80.)  Plaintiff then began its so-called "onboarding process."  (Dkt. 222-1 at 36:12–16.)   This includes know a your customer ("KYC") processes, anti-money laundering ("AML") checks, and background sanctions list checks.  (*Id.* at 36:12–16, 66:19–23.)  As part of this process, Plaintiff asks potential counterparties for various documents and information, including company formation documents and "ultra-beneficial owner" information.  (Dkts. 229-2 ¶ 58; 235 ¶ 58.)  Plaintiff also runs a search against the counterparty's name and the names of any known individuals to see if those names appear on any sanctions list, are linked to a politically exposed person, or are associated with any adverse media. (Dkts. 229-2 ¶ 60; 235 ¶ 60.)  Raj Radia, Plaintiff's compliance officer, testified the due diligence he performs does not vary depending on the amount of a transaction.  (Dkt. 222-1 at 60:9–12.)  He also said that, unless there was anything alarming, he would not deviate from the standard processes.  (*Id.* at 60:14–16.)

At some point (which the parties do not identify), Plaintiff completed its due diligence on the parties involved. Mr. Radia onboarded OTC Desks. (Dkts. 229-2 ¶¶ 242–45; 235 ¶¶ 242–45.) Mr. Radia and Mr. Gil each completed some level of due diligence on the Austins and Valkyrie. (Dkts. 229-2 ¶¶ 248–49; 235 ¶¶ 248–49; 221-1 at 71:6–12.) Mr. Gil testified that, based on the work he did looking into the Austins and Valkyrie, he felt comfortable moving ahead with the transaction. (Dkt. 221-1 at 71:21–25.) Mr. Radia also completed Plaintiff's due diligence on Alivic and Sumich and onboarded them. (Dkts. 229-2 ¶¶ 253–54; 235 ¶¶ 253–54.) Mr. Rosenblum did some due diligence on Alivic and Sumich as well and found that the "mosaic of information painted [the proposed transaction] towards being somewhat suspicious, but [Plaintiff] felt safeguarded by the fact that there [was] an IOLTA account." (Dkt. 225-1 at 107:22–108:6.)

### 2. Wells Fargo's Involvement as an Account Provider

As explained, Plaintiff and Alivic agreed to use Ms. McDonald as their escrow agent. (Dkts. 229-2 ¶ 91; 235 ¶ 91.) Ms. McDonald actually has two law firms, McDonald Law Group and the Law Office of Diana McDonald. (Dkts. 229-2 ¶ 1; 235 ¶ 1.) Ms. McDonald had been banking

with Wells Fargo for about thirty years.  (Dkts. 229-2 ¶ 2; 235 ¶ 2.) During the relevant time, she had six accounts with Defendant Wells Fargo for her law firms.  (Dkts. 229-2 ¶ 3; 235 ¶ 3.)  McDonald Law Group had two IOLTA accounts, one ending in -4172 ( hereinafter the "IOLTA Account"), and one business checking account.  (Dkts. 229-2 ¶ 4; 235 ¶ 4.) The Law Office of Diana McDonald had two IOLTA accounts, one ending in -5641 ("5641 Account"), and one business checking account.  (Dkts. 229-2 ¶ 5; 235 ¶ 5.)  Some of the he accounts have had little or no activity for long periods of time.  (Dkts. 236 ¶ 10; 241 ¶ 10.)  Ms. McDonald had incurred a few overdraft but always remedied the problem quickly.  (Dkt. 220-1 at 71:11–17.)  After the events at issue in this case, Defendant closed all her law firms' accounts.  (Dkts. 229-2 ¶ 10; 235 ¶ 10.)

Defendant's Deposit Account Agreement, which applied to the IOLTA Account, stated:

**What are we allowed to do if there is an adverse claim against your account?**

An adverse claim occurs when

- Any person or entity makes a claim against your account funds,
- We believe a conflict exists between or among your account's owners, or
- We believe a dispute exists over who has account ownership or authority to withdraw funds from your account.

In these situations, we may take any of the following actions without any responsibility to you:

- Continue to rely on the documents we have on file for your account.
- Honor the claim against your account funds if we are satisfied the claim is valid.
- Freeze all or a part of the funds in your account until we believe the dispute is resolved to our satisfaction.
- Close your account and send a check for the available balance in your account payable to you or to you and each person or entity who claimed the funds.
- Pay the funds into an appropriate court.

(Dkts. 236 ¶ 50; 241 ¶ 50.)  Defendant's Commercial Account Agreement

policy states:

> **Adverse Claims.**
>
> If any person or entity makes a claim against funds in Company's Account, or if Bank believes that a conflict exists between or among the Authorized Signers on Company's Account or that there is a dispute over matters such as the ownership of Company's Account or the authority to withdraw funds from Company's Account, Bank may, without any liability to Company, take one or more of the following actions: (i) continue to rely on Bank's records to determine the ownership of or the identity of the Authorized Signer(s) for Company's Account; (ii) honor the claim upon receipt of evidence satisfactory to Bank to justify such claim; (iii) freeze all or a part of the funds in Company's Account until the dispute is resolved to Bank's satisfaction; (iv) close Company's Account and send a check for the available balance in Company's Account payable to Company or to Company and each claimant; or (v) pay the funds into an appropriate court.

(Dkts. 236 ¶ 51; 241 ¶ 51.)

Andrew Shannon, Defendant's representative for Ms. McDonald's

accounts, testified he was unaware whether Defendant conducted any

periodic reviews of Ms. McDonald and her accounts even though Wells Fargo has a periodic review process to make sure it updates information. (Dkts. 236 ¶ 15; 241 ¶ 15; 219-1 at 127:18–19.)  He did have occasional calls with Ms. McDonald.  (Dkts. 236 ¶ 17; 241 ¶ 17.)  Ms. McDonald spoke with Mr. Shannon about various large transactions she expected into her accounts, but those transactions never occurred.  (Dkts. 219-1 at 273–77; 236 ¶ 19; 241 ¶ 19.)

Mr. Gil testified that Mr. Radia would have been responsible for due diligence on Ms. McDonald as part of the Bitcoin transaction, but he remembered also looking at her website himself.  (Dkt. 221-1 at 70:24–71:1; 115:22–116:7.)  Mr. Radia testified he did not do a KYC check on Ms. McDonald to the extent Plaintiff would have for a seller and did not formally onboard Ms. McDonald.  (Dkt. 222-1 at 101:23–102:2, 103:20–24.)  Mr. Radia explained that, once Plaintiff was given Ms. McDonald's name, there "may have been some due diligence done around the name just to verify if . . . she was a lawyer registered with the bar and if she had her own practice." (*Id.* at 131:23–132:5.)  Mr. Radia testified "maybe" for this type of deal, given the size, Plaintiff did "some additional checks to ensure that everything is as it's supposed to be, just to ensure . . . the

13

necessary protections are there." (*Id.* at 137:20–138:5.) Mr. Gil, testifying as Plaintiff's Rule 30(b)(6) representative, explained Plaintiff was most assured by the fact that Ms. McDonald was an attorney and escrow agent, "and more importantly," she had an IOLTA account at Wells Fargo. (*Id.* at 63:6–12.) He explained that "[i]f a U.S.-based attorney who is officially an escrow agent has an IOLTA account at one of the largest financial institutions in the United States of America, I feel confident." (*Id.* at 63:13–16.) What gave Plaintiff comfort was knowing it was wiring money into an IOLTA account at Wells Fargo rather than to some "random bank [they] had never heard about." (*Id.* at 83:1–5.)

### 3.    More About the Underlying Transaction

The January 1 non-binding letter of intent stated, that after test purchase of 100 Bitcoin, Plaintiff intended to purchase larger amounts of Bitcoin in a series of transactions.[2] (Dkts. 229-2 ¶ 81; 235 ¶ 81.) Plaintiff

---

[2] There are certain things a Bitcoin buyer can do to ensure a seller actually has Bitcoin to sell. (Dkts. 229-2 ¶ 64; 235 ¶ 64.) Often when Plaintiff starts a relationship with a new person or company, it does a test transaction in which it gets "some degree of comfort from knowing that [the person or company] [is] able to deliver coins." (Dkt. 221-1 at 62:21–25.) To ensure a seller has Bitcoin, a buyer can ask for the seller's Bitcoin wallet address, go to a block explorer, input the Bitcoin wallet address, and see how many Bitcoins are in that wallet. (Dkt. 221-2 at

did not go through with the test purchase.  (Dkts. 229-2 ¶ 82; 235 ¶ 82.)

Nevertheless, on January 2, 2019, Plaintiff signed a letter agreeing that

"upon review and confirmation of the coin supply and validated KYC,"

Plaintiff will move forward with its intent to purchase the first tranche.

(Dkts. 229-2 ¶ 83; 235 ¶ 83.)

On the same day, Mr. Rosenblum talked to Ms. McDonald as

additional due diligence on her.  (Dkts. 229-2 ¶ 85; 235 ¶ 85.)  He asked

her about her legal practice, how long her practice had been in business,

the type of legal work she was involved in, how long her IOLTA account

had been active, what types of transactions it was used for, and whether

it had been used for Bitcoin transactions before.  (Dkt. 225-1 at 78:18–

79:9.)  Despite receiving pushback from Yavorsky and Hugh Austin, Ms.

McDonald answered Mr. Rosenblum's questions to his satisfaction.

(Dkts. 229-2 ¶ 267; 235 ¶ 267.)  Mr. Rosenblum also checked to make sure

she was an active member of the Georgia bar, looked up her law firm's

website, and confirmed her voice.  (Dkt. 225-1 at 79:12–80:3.)  Mr.

Rosenblum testified that, when he performed a Google search on Ms.

---

65:24–66:6.)  To confirm the person who gave the wallet address has
control of that wallet, a buyer can ask the person to send a small fraction
of one Bitcoin elsewhere.  (*Id.* at 66:7–13.)

McDonald and her law firms, "so little" came up which "drew some suspicion" given that Ms. McDonald was represented to Plaintiff as having the "history of . . . a storied career as a lawyer." (Dkts. 229-2 ¶ 276; 235 ¶ 276.)  But, this was not enough for Plaintiff to consider the results of the search to be a red flag.  (*Id.*)  During the call, Ms. McDonald said Plaintiff would not be allowed to speak directly with her banker at Wells Fargo.  (Dkts. 229-2 ¶ 86; 235 ¶ 86.)  Plaintiff contemplated Ms. McDonald may not have been forthcoming with Defendant in using her accounts for Bitcoin transactions.  (Dkts. 229-2 ¶ 88; 235 ¶ 88.)

On January 3, 2019, Plaintiff agreed to purchase Bitcoin.  The agreement listed Plaintiff as the "Buyer" and Valkyrie (in partnership with OTC Desks) as the "Seller."[3]  (Dkts. 229-2 ¶ 89; 235 ¶ 89.)  Plaintiff agreed to wire the money for the proposed transaction to Ms. McDonald's

---

[3] Wells Fargo is not a party to the Agreement and Plaintiff never entered into any written agreements with Defendant in connection with the proposed transaction.  (Dkts. 229-2 ¶¶ 93, 232; 235 ¶¶ 93, 232.)  Plaintiff has also never been Defendant's customer or had a banking relationship with Defendant.  (Dkts. 229-2 ¶ 233; 235 ¶ 233.)  Plaintiff does not recall whether it sent the Agreement to Defendant before filing its complaint. (Dkts. 229-2 ¶ 236; 235 ¶ 236; 221-2 at 22:3–23:3.)  Plaintiff has also never entered into a written agreement with Ms. McDonald or her law firms in connection with the proposed transaction.  (Dkts. 229-2 ¶ 231; 235 ¶ 231.)

IOLTA Account.  (Dkts. 229-2 ¶ 91; 235 ¶ 91.)  Before wiring any funds, Mr. Gil contacted Defendant and confirmed Mr. Shannon worked there. (Dkts. 229-2 ¶¶ 94–95; 235 ¶¶ 94–95.)  He never mentioned Bitcoin or the proposed transaction and did not ask for information about Ms. McDonald or her accounts.  (*Id*.)

Plaintiff wired $4 million into the IOLTA Account.  (Dkts. 229-2 ¶ 96; 235 ¶ 96.)  By the end of the day, the IOLTA Account had only $3,360,094.14—Ms. McDonald having done something with the difference.  (Dkts. 229-2 ¶ 100; 235 ¶ 100.)

### 4.   The Sellers Failure to Deliver Bitcoin and Plaintiff's Contacts with Defendant Wells Fargo

On January 4, 2019, Plaintiff negotiated and agreed on the purchase price for the Bitcoin.  (Dkts. 229-2 ¶ 108; 235 ¶ 108.)  Plaintiff thus expected delivery that day.  (Dkts. 229-2 ¶ 109; 235 ¶ 109.)  It did not happen.  (Dkts. 229-2 ¶ 110; 235 ¶ 110.)  By the end of the day, the IOLTA Account balance had dropped to $1,910,094.13.  (Dkts. 229-2 ¶ 113; 235 ¶ 113.)

The next day, the parties agreed the Bitcoin would be delivered by 7:00 a.m. on January 7, 2019.  (Dkts. 229-2 ¶ 119; 235 ¶ 119.)  That did

not happen.  (Dkts. 229-2 ¶ 120; 235 ¶ 120.)  There were no transactions in the IOLTA Account that day.  (Dkts. 229-2 ¶ 121; 235 ¶ 121.)

On January 7, 2019, Mr. Gil and Aaron Krowne (Plaintiff's counsel) contacted Defendant and spoke with Mr. Shannon.  (Dkts. 229-2 ¶ 125; 235 ¶ 125.)  This was the first time Plaintiff contacted Defendant about the transaction.  (Dkts. 229-2 ¶ 126; 235 ¶ 126.)  Mr. Shannon did not know Mr. Krowne, Mr. Gil, or Plaintiff before the call.  (Dkt. 223-1 at 215:10–13.)  Mr. Shannon confirmed he knew Ms. McDonald, that she was an escrow agent, and that she had an IOLTA account.  (Dkt. 221-1 at 148:8–12.)  He refused to disclose any more private information other than to say Ms. McDonald had been a long-time customer in good standing.  (*Id.* at 148:13–16.)

Following the January 7 call, Mr. Krowne sent Mr. Shannon an email "formally requesting an inquiry into the McDonald Law Group IOLTA account . . . regarding the [$4 million] in funds [sent] in by GSR Markets, Ltd."  (Dkt. 220-1 at 468.)  Mr. Krowne stated that "the property-conveyance leg of the transaction was never fulfilled by the seller, McDonald's client . . . [and] [a]fter multiple missed deadlines by the seller, GSR has requested to cancel the transaction and be refunded."

(*Id.*)  He noted Ms. McDonald had been unresponsive.  (*Id.*)  Mr. Krowne stated, "[t]his query should initiate the process of potentially freezing and returning mishandled IOLTA funds, with prospective attorney disciplinary ramifications."  (*Id.*)  Mr. Shannon responded, saying he would escalate the concern (which he did by contacting his legal department).[4]  (Dkts. 229-2 ¶¶ 135, 140; 235 ¶¶ 135, 140.)  Mr. Shannon also talked to Ms. McDonald, who said she would call Plaintiff immediately.  (Dkts. 229-2 ¶ 141; 235 ¶ 141.)

By this time, Mr. Shannon was concerned about Ms. McDonald's accounts, in part, because he had recently received another complaint about how she had handled two other escrow deposits.  (Dkts. 236 ¶ 42; 241 ¶ 42; 220-1 at 133:14–134:3.)  Specifically, in December 26, 2018, Mr. Shannon received an email from a person named David Roth.  Mr. Roth said his company had deposited a large amount of money in Ms. McDonald's escrow account and she had ignored his request to have some

---

[4] Under Defendant's policy and procedure, if an employee received a report of potential fraud, he would escalate the report to his leader and the leader would review it and determine next steps.  (Dkts. 229-2 ¶ 138; 235 ¶ 138.)  Once escalated, if the leader decided to move forward with the report, he or she would further escalate the report to the regional consultant who may pull in the in-house legal department.  (*Id.*)

of it returned.  (Dkts. 229-2 ¶ 34; 235 ¶ 34; 220-1 at 123:18-125:7.)  Mr. Roth identified another person (Mornay Johnson) who was also having trouble getting Ms. McDonald to return escrow funds.  (Dkt. 219-1 at 956.)  Mr. Shannon called Ms. McDonald about Mr. Roth's email, and Ms. McDonald said she would speak with Mr. Roth "and handle the situation."  ((Dkts. 229-2 ¶ 35; 235 ¶ 35.; 220-1 at 126:13-16.)  Defendant did not freeze Ms. McDonald's account upon receipt of the email.  (Dkts. 236 ¶ 33; 241 ¶ 33.)  According to Plaintiff's expert, "[t]his communication should have raised a red flag and, in [her] opinion, initiated a suspicious activity review of the law firm's accounts which would have pointed out the transfers from IOLTAs to related McDonald . . . accounts."  (Dkts. 236 ¶ 32; 241 ¶ 32.)

Unbeknownst to Mr. Shannon, Defendant had also received another report related to Ms. McDonald's IOLTA accounts.  (*Id.*)  In January 2018, Rena McDonald, a Nevada attorney with no connection to the Ms. McDonald involved in this case or her law firms, began receiving inquiries relating to funds being transferred to a "McDonald Law Group" IOLTA account and her acting as escrow agent for Bitcoin transactions.  (Dkts. 229-2 ¶¶ 19–21; 235 ¶¶ 19–21; 243-1 at 103.)  The referenced

IOLTA account was Ms. McDonald's IOLTA Account. (*Id.*) Rena McDonald became concerned about the integrity of her account, which was also at Wells Fargo. (Dkts. 229-2 ¶ 22; 235 ¶ 22.)

Rena McDonald called Wells Fargo about her concerns, specifically that she thought someone had set up an account in the name of her law firm for the purpose of scamming people out of money being used to buy Bitcoin. (Dkt. 243-1 at 103.) Defendant's representative allayed Rena McDonald's concerns, assuring her (1) the IOLTA Account was not associated with her or her law firm; (2) she was not listed as an authorized user on the IOLTA Account; and (3) the only Wells Fargo accounts associated with her and her law firm were ones she opened. (Dkts. 229-2 ¶ 23; 235 ¶ 23.)[5]

---

[5]Following the call, Rena McDonald went to a Wells Fargo branch in Nevada and talked to an employee about her concerns. (Dkts. 229-2 ¶ 26; 235 ¶ 26.) Rena McDonald told the employee she was concerned someone was using her to hurt other people. (Dkt. 243-1 at 32:8–9.) The banker indicated he shared that concern but reminded her there could be other McDonald Law Groups in other states with Wells Fargo accounts. (*Id.* at 32:4–10.) Rena McDonald told the banker about her January 25, 2018 call with Wells Fargo but did not give him any more information about it. (*Id.* at 32:13–18, 53:17–21.) The conversation further alleviated her concerns and she did not ask the banker to do anything else. (*Id.* at 32:18–19; 53:17–21.) Rena McDonald never spoke with anyone else at Wells Fargo about her concerns. (Dkts. 229-2 ¶ 29; 235 ¶ 29.) She

A Wells Fargo representative escalated Rena McDonald's call to her supervisor, asking whether there should be any further action. (Dkts. 229-2 ¶ 30; 235 ¶ 30; 219-1 at 143:9–16.) Defendant was not aware of any further action. (Dkt. 219-1 at 143:17–18.) Rena's account was verified to be safe, secure, and not exposed in any way. (*Id.* at 143:19–23.) Plaintiff's expert (Terri Sands), however, testified that a review of Ms. McDonald's IOLTA Account at the time of Rena McDonald's complaint would have raised suspicions. (Dkts. 236 ¶ 26; 241 ¶ 26; 223-1 at 394.)

Again, Mr. Shannon was unaware of Rena McDonald's complaints at the time relevant to the dispute here.

On January 7, Mr. Krowne sent another email to Mr. Shannon and Jennifer Floyd (a relationship associate for Defendant.) (Dkt. 220-1 at 472.) Mr. Krowne explained he had spoken with Ms. McDonald and received a letter from her proposing to deliver the Bitcoins by the end of

---

believed Defendant would follow up on her reports. (Dkts. 229-2 ¶ 24; 235 ¶ 24; 243-1 at 63:2–13.) Rena McDonald could not recall the exact words Defendant's representative used but the "inference" was that Defendant would look into her concerns. (Dkt. 243-1 at 63:4–6.)

the day.  (*Id.* at 473.)  He explained Ms. McDonald had also agreed that, if the seller failed to deliver the Bitcoin by then, she would begin transferring Plaintiff's escrowed funds back to Plaintiff on January 8. (*Id.* at 476.)  Mr. Krowne, however, told Ms. McDonald the transaction should be considered canceled and Plaintiff's funds sent back.  (*Id.* at 473.)

As of January 7, 2019, the IOLTA Account had an ending balance of $1,310,054.14.  (Dkts. 229-2 ¶ 147; 235 ¶ 147.)  There were no transactions on the IOLTA Account on that day, but there was one wire transfer of $800,000 to Agtex Group LLC debited from one of Ms. McDonald's other accounts.  (Dkts. 229-2 ¶¶ 153, 158; 235 ¶¶ 153, 158.) Ms. Floyd approved that wire and testified she did not ask Ms. McDonald any questions about it because Ms. McDonald said everything was handled.  (Dkts. 236 ¶ 45; 241 ¶ 45; 237-3 at 33:6–10, 34:1–10.)

The Bitcoins were not delivered on January 8, 2019.  (Dkts. 229-2 ¶ 144; 235 ¶ 144.)

The next day, Plaintiff talked to Defendant.  (Dkts. 229-2 ¶ 160; 235 ¶ 160.)  Following the call, Plaintiff sent Defendant an email stating: "Thus, we would like to request from Wells at this point (1) assurance

that GSR's [$4 million] in funds deposited with Ms. McDonald have not been removed, and (2) for Wells to reach out to Ms. McDonald and impress upon her the seriousness of the situation." (Dkts. 229-2 ¶ 161; 235 ¶ 161.) Defendant forwarded the information to its legal department. (Dkts. 229-2 ¶ 165; 235 ¶ 165.)

On January 10, 2019, Ms. McDonald sent Mr. Shannon an email:

> I understand that a gentleman by the name of Cristian Gil may have contacted you regarding my McDonald Law Group account with Wells Fargo. Mr. Gil has no authority to contact you regarding that account. A business dispute has arisen between certain parties which they are in the process of resolving. Any referenced by Mr. Gil to fraud etc (*sic*) is total unwarranted and he knows that. Apparently he believes he can throw around certain words and bully me into taking action that is not in the best interest of the parties involved. I have been a customer of Wells Fargo for over 30 years and I can assure you that nothing untoward has occurred in this matter.

> If Mr. Gil continues down this path, I will be forced to file a court interpleader action and place any disputed funds in the court's registry.

(Dkts. 229-2 ¶ 175; 235 ¶ 175.)  Mr. Shannon forwarded the email to Connie Smith, Defendant's Commercial Banking Manager.  (Dkts. 229-2 ¶ 177; 235 ¶ 177; 220-1 at 14:5–10.)

On January 11, 2019, Mr. Gil contacted Defendant and spoke with Ms. Floyd.  (Dkts. 229-2 ¶ 183; 235 ¶ 183.)  The same day, and again on

January 14, Mr. Krowne emailed Mr. Shannon. (Dkts. 229-2 ¶¶ 185, 193; 235 ¶¶ 185, 193.) Both emails were forwarded to Defendant's legal department. (Dkts. 229-2 ¶¶ 186, 194; 235 ¶¶ 186, 194.)

On January 14, 2019, Plaintiff made a request on its bank to submit a wire transfer recall request to Defendant. (Dkts. 229-2 ¶ 195; 235 ¶ 195.) Mr. Gil forwarded the wire recall request to Mr. Shannon. (Dkts. 229-2 ¶ 197; 235 ¶ 197.)

On January 16, 2019, Mr. Krowne sent Mr. Shannon a letter summarizing Plaintiff's position of events relating to the proposed transaction and IOLTA Account. (Dkts. 229-2 ¶ 203; 235 ¶ 203.)

On January 14 or 16, Ms. Floyd was told "to just do nothing, say nothing, don't touch anything." (Dkts. 236 ¶ 59; 241 ¶ 59.) She testified that it was fair to say she took this to mean she was not supposed to authorize wires, verify anything, or do anything with these accounts. (Dkts. 236 ¶ 59; 241 ¶ 59; 237-3 at 28:23–29:16.) Ms. Floyd, however, never got anything confirming this in writing. (Dkt. 237-3 at 30:20–22.)

On January 18, 2019, Plaintiff received $2,000,000 back from Ms. McDonald. (Dkts. 229-2 ¶ 210; 235 ¶ 210.) On that day, the IOLTA Account was credited $800,000 from the 5641 Account and debited

$2,000,000.   (Dkts. 229-2 ¶¶ 211–12; 235 ¶¶ 211–12.)   The IOLTA Account had an ending balance of $110,054.14.   (Dkts. 229-2 ¶ 213; 235 ¶ 213.)   There were no further transactions on the IOLTA Account until a withdrawal of $110,054.14 as part of this litigation.   (Dkts. 229-2 ¶ 214; 235 ¶ 214.)   There were also no other transactions in Ms. McDonald's 5641 account until a withdrawal of $200,020.92 also as part of this litigation.   (Dkts. 229-2 ¶ 217; 235 ¶ 217.)

On January 24, 2019, Defendant received the wire transfer recall request.   (Dkts. 229-2 ¶ 218; 235 ¶ 218.)   The email was forwarded to Defendant's legal department.   (Dkts. 229-2 ¶ 219; 235 ¶ 219.)   After speaking with Ms. McDonald on January 28, 2019, Mr. Shannon stated in an email dated January 29 that Ms. McDonald denied authorization for the requested recall.   (Dkts. 229-2 ¶ 220; 235 ¶ 220.)   In this email, he stated: "Ms. McDonald suggested a portion of funds has been returned and Bitcoin sent as transaction mandated. Between funds that have been returned and Bitcoin delivered, she feels no other funds are to be returned, transaction is complete."   (Dkts. 229-2 ¶ 221; 235 ¶ 221.)

On February 4, 2019, Richard Robbins, Plaintiff's counsel, sent a letter to Defendant summarizing Plaintiff's issues with the transaction

26

and requesting Defendant freeze the IOLTA Account. (Dkts. 229-2 ¶ 222; 235 ¶ 222.) On February 12, 2019, Raymond Lynch, Defendant's in-house counsel responded stating that Mr. Robbins' request constitutes an adverse action, but Defendant would not honor the request since Plaintiff failed to comply with O.C.G.A. § 7-1-353 by providing some indemnification. (Dkts. 229-2 ¶ 224; 235 ¶ 224; 221-5 at 69.) Mr. Lynch also stated Defendant could not release any information about a customer's account absent a court order, subpoena, or the customer's consent. (*Id.*) At the time, Ms. McDonald still had authority and control over the IOLTA Account.[6] (Dkts. 229-2 ¶ 226; 235 ¶ 226.) Plaintiff's expert, Terri Sands, testified she was unaware of whether Plaintiff submitted or offered to submit a bond of other indemnity in connection with its adverse claim against Defendant. (Dkts. 229-2 ¶ 235; 235 ¶ 235.)

On March 1, 2019, Plaintiff filed its verified complaint. (Dkts. 229-2 ¶ 237; 235 ¶ 237.) The same day, Plaintiff filed a motion for temporary restraining order ("TRO") against Ms. McDonald, her law firms, and Defendant Wells Fargo seeking an order for Defendant to freeze any

---

[6] The Court does not interpret this fact to mean Ms. McDonald *alone* has control over the IOLTA Account.

Wells Fargo account belonging to Ms. McDonald or her firms if Defendants could not transfer $2 million into the Registry of the Court. (Dkts. 229-2 ¶ 238; 235 ¶ 238.)  On March 4, 2019, the Court granted the TRO and set a hearing for preliminary injunction.  (Dkts. 229-2 ¶ 239; 235 ¶ 239.)  As soon as the Court entered the order, Defendant froze the accounts belonging to Ms. McDonald and her law firms.  (Dkts. 229-2 ¶ 240; 235 ¶ 240.)

## II.   Legal Standard

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  *W. Grp. Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1360 (11th Cir. 1999) (citing *Anderson*, 477 U.S. at 248).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 1361 (citing *Anderson*, 477 U.S. at 248).

The party moving for summary judgment bears the initial burden of showing the court, by reference to materials in the record, that there

is no genuine dispute as to any material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The nonmoving party then has the burden of showing that summary judgment is improper by coming forward with "specific facts" showing there is a genuine dispute for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)). Ultimately, there is no "genuine issue for trial" when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. A district court must "resolve all reasonable doubts about the facts in favor of the non-movant[] and draw all justifiable inferences in his or her favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (alteration adopted) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## III.   Discussion

Plaintiff sued Defendant for aiding and abetting fraud, breach of fiduciary duty, and conversion; negligence; accounting and equitable and injunctive relief; punitive damages; and attorneys' fees.  (Dkt. 76 ¶¶ 134–147, 153–163, 171–180, 190–198, 219–222, 244–251.)  Defendant moves for summary judgment on all claims, first claiming preemption, then claiming statutory immunity, and finally addressing the substance of each claim.   (Dkt. 217.)[7]   The Court rejects Defendants first two arguments but agrees Defendant is entitled to summary judgment on its third.

### A.    Preemption

Defendant contends all Plaintiff's claims are preempted by Article 4A of the UCC because they arise out of fund transfers completed out of the IOLTA Account.  (Dkt. 217-1 at 16.)  Plaintiff, however, argues its claims are based on Defendant's failure "to take any steps to protect GSR's funds in McDonald's IOLTA when Wells Fargo knew or should

---

[7]Plaintiff agrees its claims for accounting and injunctive relief are moot. (Dkt. 234 at 35 n.6.)  The Court thus dismisses those claims.

have known that the funds were fraudulently obtained and disposed of,"

thus bringing the claims out from under Article 4A. (Dkt. 234 at 21.)

"[P]arties whose conflict arises out of a funds transfer should look

first and foremost to Article 4-A for guidance in bringing and resolving

their claims. . . ." *Sheerbonnet, Ltd. v. Am. Express Bank, Ltd.*, 951 F.

Supp. 403, 407 (S.D.N.Y. 1995). The Eleventh Circuit has explained:

> The rules that emerged during the drafting of the U.C.C. "are
> intended to be the exclusive means of determining the rights,
> duties and liabilities of the affected parties in any situation
> covered by particular provisions of the Article." However,
> Article 4A is not the "exclusive means by which a plaintiff can
> seek to redress an alleged harm arising from a funds
> transfer." "The Article itself is replete with references to
> common law remedies." "[T]he Drafting Committee intended
> that Article 4A would be supplemented, enhanced, and in
> some places, superceded by other bodies of law ... the Article
> is intended to synergize with other legal doctrines." "The
> legislative intent reflected here is that carefully drafted
> provisions . . . are not to be side-stepped when convenient by
> reference to other sources of law. But where the provisions do
> not venture, the claimant need not turn back; he or she may
> seek other guides, statutory or judicial." Therefore, the only
> restraint on a plaintiff is that "resort to principles of law or
> equity outside of Article 4A is not appropriate to create rights,
> duties and liabilities *inconsistent* with those stated in this
> Article."

*Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267, 1274–75 (11th Cir.

2003) (internal citations omitted). In that case, a dispute arose between

two banks following a wire transfer when the defendant-bank used the

funds accepted on behalf of the beneficiary as a setoff against a debt owed to it by the same beneficiary. *Id.* at 1270. The plaintiff-bank alleged the defendant-bank accepted the funds when it knew or should have known the funds were fraudulently obtained. *Id.* at 1273. The Eleventh Circuit held that "Article 4A does not preempt a state law claim if money is transferred by wire to a party that knows or should have known that the funds were obtained illegally," but nevertheless affirmed summary judgment to the defendant-bank because plaintiff-bank failed to present evidence showing there was a genuine issue of fact about whether defendant-bank knew or should have known the funds had been fraudulently obtained. *Id.* at 1279.

Plaintiff contends here, as in *Regions Bank*, Article 4A does not address its claims—Defendant's failure to take any steps to protect Plaintiff's funds in the IOLTA Account—when Defendant knew or should have known the funds were fraudulently obtained and retained. (Dkt. 234 at 21.) So, plaintiff says there is no preemption. Defendant disagrees, saying the facts in *Regions Bank* are distinguishable from the facts here because "*Regions Bank* involved a situation in which the defendant-bank itself received a payment from the fraud it allegedly

32

knew of (because it used the fraudulent funds to pay a debt owed to it by the beneficiary)."  (Dkt. 240 at 8–9 (quoting *Zeal Global Servs. Private Ltd. v. SunTrust Bank*, 508 F. Supp. 3d 1303, 1312 (N.D. Ga. 2020)).)  While that may be a factual distinction, it does not make a legal difference.  The Eleventh Circuit in *Regions Bank* did not rely on the fact the defendant-bank directly received a payment.  The Eleventh Circuit found that

> Article 4A is silent with regard to claims based on the theory that the beneficiary bank accepted funds when it knew or should have known that the funds were fraudulently obtained. Therefore, a provision of state law that requires a receiving or beneficiary bank to disgorge funds that it knew or should have known were obtained illegally when it accepted a wire transfer is not inconsistent with the goals or provisions of Article 4A.

*Regions Bank*, 345 F.3d at 1275; *see also Hofschutle v. SunTrust Banks, Inc.*, 2021 WL 5230732, at *2 (N.D. Ga. Mar. 4, 2021) ("As Article 4A is silent with regard to claims based on the theory that the receiving or beneficiary bank accepted funds into an account when it knew or should have known that the account was fraudulent, principles of common law negligence which would require a receiving or beneficiary bank to disgorge funds that it knew or should have known were obtained illegally when it accepted a wire transfer is not inconsistent with any of the

provisions of Article 4A."). To interpret Article 4A in a manner to protect banks that receive and retain funds they know or should know are fraudulently obtained, would provide a shield against liability for fraudulent activity. "[I]t could hardly have been the intent of the drafters [of Article 4A] to enable a party to succeed in engaging in fraudulent activity, so long as it complied with the provisions of Article 4A." *Regions Bank*, 345 F.3d at 1276. *Regions Bank* also involved a beneficiary bank allegedly accepting funds when it knew or should have known the funds were fraudulently obtained, whereas here, Plaintiff's complaints surround the disbursement of funds from the IOLTA Account when Defendant knew or should have known the funds were fraudulently obtained. The Court sees no reason why this distinction is material as immunity for such conduct would still provide a shield for fraudulent activity. And even if the distinction is material, Wells Fargo also did not reverse the wire, seize the funds, or stop subsequent wires when they knew or should have known about the fraud.

Defendant next argues that, regardless of how the Court applies *Regions Bank*, the purported red flags Plaintiff identifies are legally insufficient to show Defendant knew or should have known the wires

were fraudulent.  (Dkt. 240 at 9.)   "[S]howing that a defendant knew or should have known of fraud on a particular wire transfer is a high hurdle."  *Zeal*, 508 F. Supp. 3d at 1313.  To meet this burden, Plaintiff relies on three sets of undisputed facts.  First, Plaintiff points to issues with Ms. McDonald's account history, including her operation of two law firms, establishing four IOLTA accounts, maintaining little or no money in the accounts, transferring funds between the IOLTA Account and other accounts, and incurring overdraft fees.  But having "poor business or accounting practices" or being an "inept business entity with questionable ethical standards" does not demonstrate fraud.  *Regions Bank*, 345 F.3d at 1277–78.  Second, Plaintiff contends Defendant was already aware of three prior reports of potential fraud by Ms. McDonald with her account.  (Dkt. 234 at 2.)  But a non-customer notifying a bank of separate instances of alleged fraud is insufficient to show a bank "knew or should have known that the *particular* . . . wire transfer at [a later time] was potentially fraudulent."  *Zeal*, 508 F. Supp. 3d at 1313; *see also Regions Bank*, 345 F.3d at 1277 (the defendant-bank's awareness that the FBI was investigating the beneficiary was inadequate to show money subsequently paid was obtained by fraud).  Finally, Plaintiff argues even

after it reported the problems in getting its escrowed funds back (and by doing so provided Defendant undisputed knowledge the wires were fraudulent), Defendant failed to act timely and responsibly.  (Dkt. 234 at 3.)   Defendant, however, says it was not until January 9 (after the disputed wires were already completed) that it was told the funds had not been transferred back to Plaintiff.  (Dkt. 240 at 10.)

The Court disagrees.  On January 7, Mr. Gil and Mr. Krowne, on behalf of Plaintiff, contacted Defendant for the first time about the transaction and spoke with Mr. Shannon.  (Dkts. 229-2 ¶¶ 125–26; 235 ¶¶ 125–26.)  Following the January 7 call, Mr. Krowne sent Mr. Shannon an email "formally requesting an inquiry into the McDonald Law Group IOLTA account . . . regarding the [$4 million] in funds [sent] in by GSR Markets, Ltd."  (Dkt. 220-1 at 468.)   Mr. Krowne stated that "the property-conveyance leg of the transaction was never fulfilled by the seller, McDonald's client . . . [and] [a]fter multiple missed deadlines by the seller, GSR has requested to cancel the transaction and be refunded the [$4 million] funds."   (*Id.*)  He further explained that Ms. McDonald had been "unresponsive" to their request.  (*Id.*)  Mr. Krowne stated, "[t]his query should initiate the process of potentially freezing and returning

mishandled IOLTA funds, with prospective attorney disciplinary ramifications." (*Id.*) Clearly, Plaintiff notified Defendant of its concerns that Ms. McDonald's client had not completed the transaction and that Ms. McDonald had not agreed to return the money.

Mr. Shannon responded to Mr. Krowne's email, indicating he would escalate the concern. (Dkts. 229-2 ¶ 135; 235 ¶ 135.) Mr. Shannon testified he was concerned because during the time Ms. McDonald had been telling Plaintiffs she would return her money, she had transferred hundreds of thousands of dollars to her other accounts. (Dkts. 236 ¶ 41; 241 ¶ 41; 220-1 at 145:24–46:12.) He also knew Ms. McDonald had transferred $25,000 to Mornay Johnson and $375,000 to Mr. Roth's company. (Dkts. 236 ¶ 41; 241 ¶ 41; 220-1 at 146:13–25.) He was concerned Ms. McDonald was using Plaintiff's escrowed money to repay the escrow money due Mr. Johnson and Mr. Roth. (Dkt, 220-1 at 147:2–11.) By this time, Mr. Shannon was concerned about Ms. McDonald's credibility and what was going on with Ms. McDonald's accounts given the notice from Plaintiff and the previous incident with Mr. Roth. (Dkts. 236 ¶ 42; 241 ¶ 42; 220-1 at 133:14–134:3.) The Court finds this raises a genuine dispute as to whether Defendant knew or should have known,

by at least January 7, that Ms. McDonald was using her IOLTA Account for fraudulent purposes.

Article 4A of the UCC thus does not preempt Plaintiff's claims. Defendant's timing argument may be relevant to damages, but it does not support its claim for preemption.

## B.   Statutory Immunity

Defendant also contends it is entitled to summary judgment because it is statutorily immune from liability.  (Dkt. 217-1 at 19–22.)  It argues it is statutorily immune from liability for Ms. McDonald's alleged misuse of funds and its response to Plaintiff's adverse claim.  (*Id.*)

### 1.   Misuse of Funds

In Georgia, "whenever any . . . fiduciary . . . shall deposit any money in any bank . . . such bank shall be authorized to pay the amount . . . upon the order of such . . . fiduciary. . . without being accountable in any way to the principal."  O.C.G.A. § 7-1-352.  "It is clear that the statute is designed to protect a bank from liability where an agent or fiduciary misappropriates funds of the owner in breach of his agency or trust without the bank's knowledge."  *Nat'l Bank of Ga. v. Weiner*, 348 S.E.2d 492, 497 (Ga. Ct. App. 1986).  A bank thus need not scrutinize every

transfer made by an escrow agent to ensure the agent acted within his or her authority. *Id.* Of course, this does not apply when a bank has knowledge of an escrow agent's breach of its fiduciary duty. *Trust Co. of Georgia v. Nathionwide Moving & Storage Co., Inc.*, 219 S.E.2d 162, 164 (Ga. 1975). "To charge a bank with knowledge of a breach of trust by a fiduciary, the circumstances must be such as to raise a presumption of knowledge that the depositor is acting dishonestly." *Focus Entm't Int'l, Inc. v. Wachovia Bank, N.A.*, 2005 WL 8155037, at *7 (N.D. Ga. Nov. 18, 2005) (internal quotations omitted). "Simple neglect to enquire about circumstances which ought to have excited attention is not enough." *Id.*

The $4 million was deposited into the IOLTA Account on January 3 pursuant to the Agreement. (Dkts. 229-2 ¶ 96; 235 ¶ 96.) Ms. McDonald made multiple transfers out of the IOLTA Account between January 3 and January 7. (Dkts. 229-2 ¶¶ 111, 147; 235 ¶¶ 111, 147.) Defendant argues these transfers "were all indisputably completed without Wells Fargo's knowledge of Ms. McDonald's alleged wrongdoing." (Dkt. 217-1 at 20.) Plaintiff contends this argument hinges on the disputed factual allegation that Defendant had no knowledge of Ms. McDonald's misappropriation of Plaintiff's funds. (Dkt. 234 at 22.) The

question raised by O.C.G.A. § 7-1-352 is "did the bank have either actual knowledge of the misapplication, or were the circumstances such as to raise a presumption of knowledge, or did the circumstances reasonably support the sole inference that a breach of trust was intended?" *First Am. Title Ins. Co. v. Apex Title Inc.*, 2012 WL 3552629, at *3 (M.D. Ga. Aug. 16, 2012). The circumstances included Ms. McDonald's account history and three reports about mishandling funds. Defendant contends the account history discussed above is insufficient to put Defendant on notice Ms. McDonald was mismanaging funds. (Dkt. 240 at 12.)

That a fiduciary transfers money into its own accounts is not *alone* sufficient to charge the bank with notice or knowledge of misappropriation. *See Tattnal Bank v. Harvey*, 198 S.E. 724, 726 (Ga. 1938); *Citizens Bank of Forsyth v. Middlebrooks*, 72 S.E.2d 298, 300 (Ga. 1952). Defendant also argues Rena and Mr. Roth's communications had nothing to do with the relevant funds or Ms. McDonald's management of those funds and, therefore, are insufficient to put Defendant on notice that Ms. McDonald was mismanaging the relevant funds. (Dkt. 240 at 13.) But to charge a bank with knowledge, the *circumstances* simply "must be such as to raise a presumption of knowledge that the depositor

is acting dishonestly." *Focus Entm't*, 2005 WL 8155037, at *7. There is no requirement the bank have knowledge about the specific funds. After reviewing Ms. McDonald's January 2019 IOLTA Account statement, Mr. Shannon was concerned because, despite telling Plaintiff she would return their money, she had transferred hundreds of thousands of dollars her other accounts and $400,000 to other entities who had accused her of misappropriated their money. (Dkts. 236 ¶ 41; 241 ¶ 41; 220-1 at 145:24–46:25.) Mr. Shannon was concerned about Ms. McDonald's credibility and her use of the IOLTA Account. (Dkts. 236 ¶ 42; 241 ¶ 42; 220-1 at 133:14–134:3.) This evidence raises a genuine dispute as to whether Defendant had knowledge Ms. McDonald was acting dishonestly. Defendant is this not entitles to the protection of O.C.G.A. § 7-1-352 at summary judgment.

## 2. Response to Adverse Claim

Defendant contends it is statutorily immune from liability for its response to Plaintiff's adverse claim. (Dkt. 217-1 at 20–22.) Georgia law states, "a bank . . . *shall not be required to* deny control over or access to a deposit account . . . to (1) [t]he customer in whose name the account . . . is held by the bank . . . or (2) [a] person . . . who is authorized to draw

on or control the account." O.C.G.A. § 7-1-353(a) (emphasis added).  A bank can deviate from this obligation and deny control over an account in reliance on a court order or other legal process; an agreement of the parties; or an adverse claim accompanied by a bond or other indemnity adequate to protect the bank from loss resulting from its action.  O.C.G.A. § 7-1-353(b).

Defendant concedes that ,with the February 4, 2019 letter, Plaintiff made an adverse claim and requested Defendant place a freeze on the IOLTA Account.  (Dkt. 217-1 at 21.)  Defendant, however, contends Plaintiff failed to comply with the statutory obligations until the TRO order, specifically in failing to post any bond.  (*Id.* at 22.)  And because Plaintiff did not comply with the requirements, Defendant did not place a freeze on the IOLTA Account.  (*Id.*)  Defendant contends it is thus statutorily immune from liability for any claim arising out of Plaintiff's allegation that Defendant should have placed a freeze on the account. (*Id.*)

Plaintiff argues, while the statute does not require Defendant to affect a freeze, it also does not shield it from liability for negligently failing to do so.  (Dkt. 234 at 24.)  The Court somewhat agrees.  The Court

finds O.C.G.A. § 7-1-353(a) allows a bank to act if the O.C.G.A. § 7-1-353(b) requirements are satisfied.  But it does not require the bank to act.  Rather, the statute gives banks rights vis-à-vis their account holders without imposing any right on third parties or requirement on the bank to act in a certain way because of an adverse claim.  It is undisputed Plaintiff did not satisfy the O.C.G.A. § 7-1-353(b) requirements, so Defendant was not authorized to deny McDonald control over the finds.  At the same time, rejects Defendants argument that the failure to provide indemnity immunized Defendant from liability to Plaintiff it might otherwise have.

## C.    Negligence

Plaintiff sued Defendant for negligence, alleging Defendant failed to protect Plaintiff's funds.  (Dkt. 76 ¶ 179.)  "It is well established that to recover for injuries caused by another's negligence, a plaintiff must show four elements: a duty, a breach of that duty, causation, and damages."  *Collins v. Athens Orthopedic Clinic, PA*, 837 S.E.2d 310, 312 (Ga. 2019).  The lack of a genuine issue of material fact on any of the elements requires entry of summary judgment for the defendant.  *Patterson v. Wright*, 840 S.E.2d 762, 763 (Ga. Ct. App. 2020).  Defendant

argues it is entitled to summary judgment because it owed no duty of care to Plaintiff. (Dkt. 217-1 at 22–26.)

"[A] legal duty is the obligation to conform to a standard of conduct under the law for the protection of others against unreasonable risks of harm." *Rasnick*, 713 S.E.2d at 837. Such a duty can arise by statute, common law, or contract. *See id.*; *Brookview Holdings, LLC v. Suarez*, 645 S.E.2d 559, 564 (Ga. Ct. App. 2007). The existence of a legal duty is a question of law for the court. *Rasnick*, 713 S.E.2d at 837. With no legal duty, there can be no fault or negligence. *Sheaffer v. Marriott Int'l, Inc.*, 826 S.E.2d 185, 188 (Ga. Ct. App. 2019).

Defendant contends that, beyond Plaintiff's conclusory allegation that Defendant owed it a duty of care, Plaintiff has alleged no duty based on legislative enactment or statute that Defendant has breached apart from the contention Defendant violated the fiduciary duty to maintain an IOLTA account. (Dkt. 217-1 at 23.) Defendant argues Plaintiff has never had a banking relationship with it and has never entered into any written agreement with it. So, Defendant says it owed Plaintiff no common law duty of care. (*Id.*)

44

Plaintiff alleges no statutory or contractual basis for a duty imposed on Defendant. Instead, Plaintiff turns to the common law, saying Defendant is liable because it knew or should have known Ms. McDonald was acting dishonestly or intended to commit a breach of trust. (Dkt. 234 at 25.)

The Court agrees Defendant owed Plaintiff no common law duty. Plaintiff was not a customer and did not otherwise have a direct relationship with Defendant. The Court thus agrees with "the weight of persuasive authority from numerous jurisdictions holding that banks do not owe a duty of care to non-customers in the context of common law tort claims." *Hofschutle*, 2021 WL 5230732, at *3.[8]  Because there is no

---

[8] *See also Zeal*, 508 F. Supp. 3d at 1316 (there is an abundance of authority holding that a bank owes no common law duty to noncustomers and the plaintiff cited no authority to the contrary); *Kalpakchian v. Bank of Am. Corp.*, 2019 WL 12426033, at *5 (N.D. Ga. Oct. 4, 2019) (plaintiff could not point to any duty of care Wells Fargo owed her (a non-customer) to prevent potentially fraudulent acts by a Wells Fargo customer); *Promissor, Inc. v. Branch Bank and Trust Co.*, 2008 5549451, at *4–5 (N.D. Ga. Oct. 31, 2008) (finding the defendant bank did not owe a duty to a non-customer); *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 225 (4th Cir. 2002) (a bank owes no duty to a "noncustomer who is defrauded by the bank's customer through use of its services" because noncustomer had "no direct relationship" with the bank) (collecting cases); *VIP Mortg. Corp. v. Bank of Am., N.A.*, 769 F. Supp. 2d 20, 27 (D. Mass. 2011) (reiterating "the now almost universal rule that banks do not owe a

recognized duty of care, there can be no breach.  The Court thus grants Defendant's motion as to Plaintiff's negligence claim.[9]

## D.    Aiding and Abetting Fraud

Plaintiff sued Defendant for aiding and abetting fraud, alleging Defendant had knowledge and notice Ms. McDonald was engaging in fraudulent behavior and failed to investigate in violation of its policies and procedures and in violation of its duties to Plaintiff.  (Dkt. 76 ¶¶ 136–45.)  The "tort of 'aiding and abetting fraud' does not exist as a basis for liability under Georgia law." *Siavage v. Gandy*, 829 S.E.2d 787, 790 (Ga. Ct. App. 2019).  Rather, "one who knowingly participates in a fraud may be held liable for the fraud."  *Id.* (internal quotations omitted).  "[T]o prove fraud in Georgia, the plaintiff must establish five elements: (1) a

---

common law duty of care to third-party non-customers"); *Nat'l Grange Mut. Ins. Co. v. Verizon's Benefits Ctr.*, 541 F. Supp. 2d 745, 749–51 (D. Md. 2008) (bank owed no duty to non-customer for allowing bank customer to deposit the plaintiff's guardianship funds into customer's personal accounts).

[9] The Court notes, despite Georgia law being clear, Plaintiff relies on an Eleventh Circuit interpretation of Florida law to suggest there is an applicable exception to the rule that financial institutions are generally not liable to noncustomers in cases of simple negligence.  (Dkt. 234 at 25 (citing *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1094–95 (11th Cir. 2017)).)  Because Florida law does not apply, any exception available under Florida law is inapplicable.

false representation by a defendant, (2) scienter, (3) intention to induce the plaintiff to act or refrain from acting, (4) justifiable reliance by plaintiff, and (5) damage to plaintiff." *Cline v. Advanced Neuromodulation Sys., Inc.*, 17 F. Supp. 3d 1275, 1287 (N.D. Ga. 2014) (citing *Summit Auto. Grp., LLC v. Clark*, 681 S.E.2d 681, 686 (Ga. Ct. App. 2009)). On a motion for summary judgment, the movant must show a "complete lack of evidence" for at least one of these elements. *Kilroy v. Alpharetta Fitness, Inc.*, 671 S.E.2d 312, 314 (Ga. Ct. App. 2008).

Defendant contends any claim for fraud fails because Plaintiff (1) has alleged no facts suggesting there was a single representation made by Defendant or that Plaintiff justifiably relied on any statement allegedly made by Defendant and (2) made no factual allegation that Defendant had the scienter or knowledge necessary to make a reckless representation, let alone the knowledge to deceive, manipulate, or defraud Plaintiff or that Defendant acted with any intent to induce Plaintiff to act or refrain from acting. (Dkt. 217-1 at 27.) Plaintiff contends Defendant is liable because it did not disclose several facts in response to Mr. Krowne's January 9 email to Mr. Shannon requesting assurance from Defendant that $4 million remained in Ms. McDonald's

account. (Dkts. 234 at 32; 220-1 at 158:20–159:8; 229-2 ¶ 161; 235 ¶ 161.) Specifically, Defendant did not disclose (1) that there were insufficient funds in the IOLTA Account to cover Plaintiff's $4 million, (2) that Ms. McDonald had improperly transferred funds from the IOLTA Account to her business accounts, and (3) that Ms. McDonald's accounts had been the subject of fraudulent activities. (Dkt. 234 at 32.)

Georgia law provides that "suppression of a material fact which a party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." *Williams v. Dresser Indus., Inc.*, 120 F.3d 1163, 1167 (11th Cir. 1997) (quoting O.C.G.A. § 23-2-53). "An obligation to disclose must exist before a party may be held liable for fraud based upon the concealment of material facts." *Id.* Plaintiff cites no authority to suggest Defendant had a duty to disclose this information at any time. The Court refuses to impose such a duty, particularly in the light of the previously discussed conclusion a bank has no common law duty of care to a non-customer. It would be odd to disavow a common law duty of care and then impose a duty of disclosure. To make matters worse for Plaintiff, its own expert

48

testified that, at the time of the January 7 call, Mr. Shannon *was not allowed to* give any information to Mr. Krowne or Mr. Gil (who were strangers at the time) about Ms. McDonald's accounts. (Dkts. 223-1 at 216:12–20; 223-2 at 72:17–73:1.)   Because Defendant had no duty to disclose the identified information, Defendant is entitled to summary judgment on Plaintiff's fraud claim.[10]

## E.    Aiding and Abetting Breach of Fiduciary Duty

Plaintiff sued Defendant for aiding and abetting breach of fiduciary duty, alleging Defendant (1) had knowledge that Ms. McDonald owed Plaintiff a fiduciary duty, (2) had knowledge the IOLTA Account was being used improperly and the funds being mishandled, and (3) did not properly investigate the matter.  (Dkt. 76 ¶¶ 156–61.)  To recover on a claim for aiding and abetting breach of fiduciary duty, a plaintiff must establish

> by proof that: (1) through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff; (2)

---

[10] Because the Court finds Plaintiff cannot show Defendant was obligated to disclose certain information, the Court will not address Plaintiff's contention that there is evidence Defendant had the requisite scienter. *See Kilroy*, 671 S.E.2d at 314 ("One challenging an assertion of fraud on motion for summary judgment need show a complete lack of evidence as to only one of [the] elements.")

with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and the intent to injure; (3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

*Intelligent Investment Int'l LLC v. Fu*, 2019 WL 1281204, at *8 (N.D. Ga. Mar. 20, 2019) (quoting *Insight Tech., Inc. v. Freight Check, L.L.C.*, 633 S.E.2d 373, 379 (Ga. Ct. App. 2006)).  As stated, such a claim requires evidence the defendant "acted to procure a breach" of the fiduciary duty. To procure "does not require the lending of assistance in the actual perpetration of the wrong," but requires the defendant give "advice, counsel, persuasion, or command . . . in procuring any person to commit an actionable wrong."  *Id.* at *9 (quoting *Insight Tech.*, 633 S.E.2d at 379 n.12.)   Defendant contends, and the Court agrees, although Ms. McDonald had a banking relationship with Defendant, no evidence suggests Defendant gave Ms. McDonald "advice, counsel, persuasion or command" to breach the duty [she] owed Plaintiff.  (Dkt. 217-1 at 30.) "This case is devoid of any evidence or allegation that [Defendant] *induced* [Ms. McDonald] to breach [her] duties to [Plaintiff]."  *Curry v. TD Ameritrade, Inc.*, 2015 WL 11251449, at *15 (N.D. Ga. June 30, 2015). Plaintiff alleges that, despite being put on notice Ms. McDonald and her

firms were improperly withdrawing Plaintiff's money or failing to return it as demanded, Defendant took no action to ensure Plaintiff's funds were safeguarded.    (Dkt. 76 ¶ 161.)    This allegation might establish Defendant's failure to stop Ms. McDonald's misconduct.    But under Georgia law, failing to stop someone else's breach of a fiduciary duty is not enough.  *Floyd v. SunTrust Banks, Inc.*, 2011 WL 2441744, at *3 n.2 (N.D. Ga. June 13, 2011) ("[T]he key to [the] claim is *inducing* the [primary wrongdoer] to improperly act." (emphasis added)).    Defendant is thus entitled to summary judgment on this claim as well.

## F.    Aiding and Abetting Conversion

Plaintiff sued Defendant for aiding and abetting conversion, alleging Defendant had actual knowledge the IOLTA Account was being used to defraud Plaintiff and assisted Ms. McDonald in her conversion of Plaintiff's funds.  (Dkt. 76 ¶¶ 190–198.)  The Court notes there does not appear to be any Georgia case law recognizing and analyzing a claim for aiding and abetting conversion.  The Court could interpret this claim in the way Georgia law treats claims for aiding and abetting fraud—that is, as a claim for the underlying tort (in this case conversion).  Or the Court could interpret aiding and abetting conversion as Georgia law treats a

claim for aiding and abetting a breach of fiduciary duty—that is, as "procuring" someone else to commit the tort (in this case procuring conversion).  Plaintiff's claim fails under both interpretations.

"To establish conversion in Georgia, a Plaintiff must show: (1) title to the property or the right of possession, (2) actual possession in the other party, (3) demand for return of the property, and (4) refusal by the other party to return the property." *DDR Corp. v. Worldpay US, Inc.*, 2017 WL 7660397, at *2 (N.D. Ga. Aug. 18, 2017).  Plaintiff argues "GSR held title to the [$4 million] while McDonald had actual possession of the funds." (Dkt. 234 at 33.)  It contends "[t]here is also evidence that GSR continuously demanded the funds be refunded and that McDonald refused." (*Id.* at 33–34.)  Plaintiff concludes: "McDonald converted the funds." (*Id.* at 34.)  Plaintiff thus appears to concede it was Ms. McDonald, *not Defendant*, who allegedly converted the funds.  Plaintiff makes no argument to suggest Defendant converted the funds.  So, if treated akin to a conversion claim, Plaintiff's aiding and abetting conversion claim fails.

If considered akin to procuring conversion, Plaintiff must prove that (1) through improper action or wrongful conduct and without

privilege, Defendant acted to procure the sellers and/or McDonald Defendant's conversion of Plaintiff's property, (2) with knowledge of the sellers and/or McDonald Defendant's duty, Defendant acted purposely and with malice and intent to injure, (3) Defendant's wrongful conduct procured the conversion, and (4) Defendant's tortious conduct proximately caused damage to Plaintiff. *See Fu*, 2019 WL 1281204, at *8. As discussed above, to procure requires the defendant give "advice, counsel, persuasion, or command . . . in procuring any person to commit an actionable wrong." *Id.* at *9 (quoting *Insight Tech.*, 633 S.E.2d at 379 n.12.) Plaintiff alleges Defendant *assisted* the sellers and Ms. McDonald (through her law firms) in its conversion of Plaintiff's funds. (Dkt. 76 ¶ 196.) But under Georgia law, assisting is not enough. *Floyd*, 2011 WL 2441744, at *3 n.2 ("[T]he key to [the] claim is *inducing* the [primary wrongdoer] to improperly act."); *Curry*, 2015 WL 11251449, at *15. The case lacks any evidence Defendant *induced* the seller's or McDonald Defendant's conversion of Plaintiff's funds. *Curry*, 2015 WL 11251449, at *15. Defendant is entitled to summary judgment on Plaintiff's claim for aiding and abetting conversion.

### G.    Punitive Damages and Attorneys' Fees

Plaintiff seeks attorneys' fees and punitive damages.  (Dkt. 76

¶¶ 244–251.)   These claims fail because Plaintiff's substantive claims

fail.[11]   *See Popham v. Landmark Am. Ins. Co.*, 798 S.E.2d 257, 263 (Ga.

Ct. App. 2017) ("[A]wards of punitive damages and attorney fees are

---

[11] Defendant contends because it was not intentionally trying to defraud
or harm Plaintiff, it is entitled to summary judgment on Plaintiff's
punitive damages claim.   (Dkt. 217-1 at 35.)   To recover punitive
damages, a plaintiff must prove "by clear and convincing evidence that
the defendant's actions showed willful misconduct, malice, fraud,
wantonness, oppression, or that entire want of care which would raise
the presumption of conscious indifference to consequences."  O.C.G.A. §
51-12-5.1(b).   "[W]hen a plaintiff fails to establish a question of fact that
a defendant's conduct was either willful or consciously indifferent to the
consequences, summary judgment on a claim for punitive damages is
appropriate." *Duling v. Domino's Pizza, LLC,* 2015 WL 3407602, at *5
(N.D. Ga Jan. 14, 2015).   While Plaintiff's expert opined that "Wells Fargo
was grossly negligent in preventing financial loss to GSR Markets
through its inaction, mishandling, and/or failure to address the Diana
McDonald relationship from a risk and fraud perspective," she testified
that it is not her opinion that Defendant was intentionally trying to
defraud or harm Plaintiff.   (Dkt. 223-2 at 147:13–17.)   "Negligence alone,
even gross negligence, is insufficient to support punitive damages." *MDC
Blackshear, LLC v. Littell*, 537 S.E.2d 356, 361 (Ga. 2000).   A reasonable
jury thus could not conclude Defendant's actions were willful or
consciously indifferent to the consequences.

derivative of underlying claims, where those claims fail, claims for punitive damages and attorney fees also fail.").[12]

## IV.   Conclusion

The Court **GRANTS** Defendant Wells Fargo's Motion for Leave to File Statement of Undisputed Facts.  (Dkt. 229.)

The Court **GRANTS** Defendant Wells Fargo Bank, N.A.'s Motion for Summary Judgment.  (Dkt. 217.)

**SO ORDERED** this 22nd day of March, 2022.

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE

---

[12] Defendant's final argument is that the complaint must be dismissed because Plaintiff is not authorized to transact business in Georgia.  (Dkt. 217-1 at 35.)   Because the Court grants Defendant's motion for the reasons discussed above, the Court will not address this argument.